

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-27-2009

# McTernan v. York

Precedential or Non-Precedential: Precedential

Docket No. 07-4437

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"McTernan v. York" (2009). *2009 Decisions.* Paper 1424.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1424

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 07-4437
(Consolidated with Nos. 07-4438 and 07-4439)
_____

JOHN McTERNAN,
Appellant

v.

CITY OF YORK, PENNSYLVANIA;
MAYOR JOHN S. BRENNER, in his official capacity;
POLICE COMMISSIONER MARK L. WHITMAN,
in his official capacity;
SERGEANT RICHARD BARTH, York Police Department,
in his official and individual capacities
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 06-cv-02132)
District Judge: Honorable John E. Jones, III

_____

Argued October 23, 2008

Before:  RENDELL, and SMITH, <u>Circuit Judges</u>,
and POLLAK,* <u>District Judge</u>.

(Filed:  April 27, 2009)
_____

Dennis E. Boyle, Esq.
Randall L. Wenger, Esq. **[ARGUED]**
Suite 200
4660 Trindle Road
Camp Hill, PA   17011-0000
 *Counsel for Appellants*
 *John McTernan; John R. Holman; Edward D. Snell*

Donald B. Hoyt, Esq.
Blakey, Yost, Bupp & Rausch
17 East Market Street
York, PA   17401

_____

*Honorable Louis H. Pollak, Senior Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Frank J. Lavery, Jr., Esq.
James D. Young, Esq.  **[ARGUED]**

2

Lavery, Faherty, Young & Patterson
225 Market Street, Suite 304
P. O. Box 1245
Harrisburg, PA   17108
  *Counsel for Appellees*
  *City of York, Pennsylvania;*
  *Mayor John S. Brenner, in His Official Capacity;*
  *Police Commissioner Mark L. Whitman, in His Official*
*Capacity;  and Sergeant Richard Barth*

_____

OPINION OF THE COURT
_____

RENDELL, Circuit Judge.

Appellant John McTernan appeals from the District Court's grant of summary judgment against him and dismissal of his *Monell* claims for municipal liability in this action pursuant to 42 U.S.C. § 1983; *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978).

**I.**

McTernan is a pro-life advocate who regularly speaks to pregnant women as they enter Planned Parenthood of Central Pennsylvania ("Planned Parenthood"), a reproductive health clinic (hereinafter "Clinic") in York, Pennsylvania.  His complaint challenges a restriction imposed by police, specifically Sergeant Barth, on his ability to walk in an alley adjacent to the Clinic to speak to clients.  Sergeant Barth, a

3

member of the City of York police department, is one of several officers assigned to overtime detail at the Clinic under a contract between Planned Parenthood and the City. McTernan Appendix ("M.A.") 182. To dissuade pregnant women from undergoing an abortion, McTernan emphasizes the sanctity of the fetus, distributes pro-life literature, and discusses alternatives to, and the health risks of, abortion. McTernan's activities emanate from deeply rooted Christian religious beliefs. M.A. 220.

**A.**

We are presented with two other appeals by protesters with complaints similar to McTernan's (*Holman v. City of York*, No. 07-4438; and *Snell v. City of York*, No. 07-4439). Each of the three appellants (collectively "appellants" or "plaintiffs") sued individually complaining of restrictions on his First Amendment rights of free speech, assembly, and religious expression. Additionally, Snell and Holman have complained that their arrests for activity outside the Clinic violated their Fourth Amendment rights. While certain facts as stated in the three appeals are similar, the claims of each were separately asserted in, and decided by, the District Court. We will therefore treat each case separately, while noting certain similarities.

McTernan's case was filed first, and we will deal herein with the common issues in depth, while the other opinions may incorporate certain principles relied upon herein by reference.

All three complaints contain certain common allegations:

(1) Plaintiffs attempt to dissuade women entering the Clinic from undergoing an abortion;

(2) Deeply rooted Christian beliefs animate plaintiffs' activities at the Clinic;

(3) Encounters between plaintiffs, other protesters, and clients are generally peaceful, and no violent altercations have occurred;

(4) On multiple occasions, officers assigned overtime detail at the Clinic have restricted plaintiffs' access to Rose Alley, a public street adjacent to the Clinic; and

(5) Access restrictions were adopted at Planned Parenthood's behest, and under "color and pretense" of the customs and policies of the City of York.

There was extensive discovery, and the facts as we recount them here are based on deposition testimony. Except where noted to the contrary, the facts are not disputed. These cases are alike in that they paint a picture, aided in part by DVDs submitted by each of the three plaintiffs, very different from most other abortion clinic protest cases. Here, the police focus was not on the disruption caused by protesters, as such; rather, the justification for the restrictions on plaintiffs' activities was grounded in a concern for traffic safety in the alley abutting the Clinic. Police worried that vehicles traveling through the alley would collide with advocates congregating there. The defendants have admitted allegations in plaintiffs' complaints as to the absence of physical confrontations of the

5

sort that frequently accompany anti-abortion proselytizing. There is no claim, and absolutely no evidence presented, that plaintiffs' activities have sparked violence, endangered clients' health, or violated clients' rights to privacy, as in other cases.[1]

**B.**

As the physical layout and setting of the Clinic are crucial to our analysis, we describe both in detail. The Clinic fronts South Beaver Street in York, Pennsylvania. Two roads run perpendicular to South Beaver Street on either side of the Clinic – Hancock Street and Rose Alley. M.A. 180 (map of Clinic environs). Rose Alley is a public street maintained by the City of York. M.A. 166. It is approximately 20 feet wide and is lightly traveled. M.A. 173, 219. A publishing business is located at the far end of the alley, and its employees, and trucks making deliveries, use the alley to access the company's parking lot. M.A. 173. There is no posted speed limit in Rose Alley, nor are there signs restricting the direction of travel or the size of vehicles using the alley. M.A. 133, 245-46. The Clinic owns or leases a front and a rear parking lot, which are used by Clinic employees and clients. M.A. 132, 173, 180. The front lot, which faces South Beaver Street, is adjacent to Rose Alley. M.A. 132,

---

[1] *See, e.g., Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 362-63 (1997); *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 758 (1994); *New York ex. rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 192 (2d Cir. 2001); *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 649 (D.C. Cir. 1994).

180.  The back lot is situated near the rear entrance of the Clinic farther down the alley.  M.A. 132, 173, 180.  Both the front and rear entrances of the Clinic feature handicap ramps. M.A. 224.[2]

Protesters may display signs, distribute literature, and engage patrons on the public sidewalks abutting the front entrance of the Clinic and running between the front parking lot and South Beaver Street. M.A. 132, 183; Holman Appendix ("H.A.") 295; Snell Appendix ("S.A.") 165.

Typically, Planned Parenthood personnel, dressed in white smocks, meet women entering the front lot and escort them across Rose Alley and over the public sidewalk to Planned Parenthood's front entrance. M.A. 219.  Other times, clients are dropped off at the rear entrance of the Clinic.  Standing at the far end of the alley, McTernan attempts to converse with these women as they enter the Clinic from the rear. M.A. 221.

## C.

On June 29, 2005, McTernan and another protester were standing in Rose Alley when a vehicle swerved sharply towards them.  Believing that the driver had acted deliberately to intimidate him, McTernan asked Sergeant Barth to charge the driver.  Sergeant Barth did not do so.  McTernan maintains that Sergeant Barth minimized the significance of the incident. M.A. 175, 274.

---

[2] The appendix reference at page 224, a DVD proffered by McTernan, depicts his exchange with Sergeant Barth.

Following the incident on June 29, 2005, police restricted access to Rose Alley. On September 28, 2005, Sergeant Barth advised protesters and Planned Parenthood escorts outside the Planned Parenthood facility, including McTernan, that they were prohibited from standing or lingering in, or "walking aimlessly" through, Rose Alley. M.A. 165-66, 183, 220, 224. Citing safety concerns and McTernan's near-collision on June 29, 2005, Sergeant Barth informed members of both camps that they would only be permitted to cross Rose Alley where it intersected with South Beaver Street. M.A. 165-66, 183. There was no vehicular traffic in the alley at the time Sergeant Barth instructed advocates. M.A. 220. Sergeant Barth noted that his instructions were generally obeyed. M.A. 166.

Sergeant Barth also told McTernan that he could walk through the alley but had to do so "legally," in the "correct way," and could not "English-walk." M.A. 220, 224. McTernan requested that Sergeant Barth define these terms but he declined to do so. M.A. 220, 224. McTernan then walked up and down the alley. After doing so, he inquired whether his manner of walking was legal. M.A. 220, 24. Sergeant Barth informed McTernan that it was not and threatened to arrest him if he did so again. M.A. 220, 224. Accordingly, McTernan did not enter Rose Alley again that day, instead using the public sidewalk in front of the Clinic to converse with clients. M.A. 174, 221. After September 28, 2005, McTernan continued his advocacy outside the Clinic but avoided Rose Alley, without further incident. M.A. 174, 221.

**D.**

8

McTernan filed suit in the United States District Court for the Middle District of Pennsylvania under 42 U.S.C. § 1983, claiming violations of his First Amendment rights of free speech, assembly,[3] and religious expression. In his complaint, McTernan named as defendants the City of York, Mayor John Brenner and Police Commissioner Mark L. Whitman in their official capacity, and Sergeant Barth, in his individual and official capacities. McTernan sought declaratory relief, temporary and permanent injunctions, and compensatory and punitive damages.

Defendants Brenner, Whitman, the City of York, and Sergeant Barth jointly filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Claims against Defendants Brenner, Whitman, and Sergeant Barth in their official capacity were dismissed. M.A. 5 (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (noting that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity[,]" since "[i]t is not a suit against the official personally, for the real party in interest is the entity.")). Dismissing McTernan's municipal liability claim against the City of York, the District Court also found that McTernan failed to identify a "custom or policy" of depriving McTernan of his constitutional rights. M.A. 6-9. The claim against Sergeant Barth in his individual capacity, however, survived dismissal by the "thinnest" margin. M.A. 11.

---

[3] McTernan references his claim of right to assembly but does not set forth a separate argument in his brief. Appellant's Br. at 16. For purposes of our analysis, we conclude that this claim is encompassed in his free speech claim.

9

After discovery, Sergeant Barth moved for summary judgment, and the District Court granted the motion. Addressing the law underpinning the "free exercise" claim, the District Court stated that if government action is "neutral and generally applicable," and burdens religious conduct only "incidentally," the Free Exercise Clause offers no protection. If, on the other hand, government action is not neutral and generally applicable, strict scrutiny applies, and the government action violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest. M.A. 20. The District Court concluded that Sergeant Barth's directive to McTernan, prohibiting his standing or lingering in the alley, was neutral and generally applicable, since the prohibition applied equally to protesters and Planned Parenthood personnel, and no evidence suggested that the restriction was prompted by hostility to McTernan's pro-life message. M.A. 20. The District Court found, further, that the prohibition only incidentally burdened McTernan's religiously motivated conduct:

> McTernan admits that the Planned Parenthood facility is bordered on two sides by public sidewalks in which he is free to engage in his religious conduct. (SUF, SIO ¶ 18; McTernan Dep. at 15-18.) McTernan admits that Sergeant Barth did not prohibit or prevent him or any member of his group from carrying signs, distributing literature, expressing their views, or otherwise engaging in religiously motivated conduct on these sidewalks or in any location other than the alley. (SUF, SIO ¶¶ 13-16; McTernan Dep. at 35-37.) McTernan

10

> retained substantial opportunity to engage in his
> religiously motivated conduct.

M.A. 21. Accordingly, the District Court found no violation of the Free Exercise Clause.

Addressing the free speech and assembly claims, the District Court applied the "forum" analysis adopted by the Supreme Court. Under this approach, the type of forum in which the speech occurs dictates the restrictions that the government may permissibly impose. *Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.*, 691 F.2d 155, 159 (3d Cir. 1982) ("The extent to which the government may limit activity protected by the First Amendment depends largely on the locale where the speech or conduct takes place.").

The Supreme Court has identified three types of fora: the traditional public forum, the designated public forum, and the nonpublic forum. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). Traditional public fora include public parks, streets, and other locales historically used for purposes of assembly, communicating with fellow citizens, and discussing public questions. *Boos v. Barry*, 486 U.S. 312, 318 (1988). The District Court concluded, and the parties do not contest on appeal, that Rose Alley is a public street maintained by the City of York and thus a traditional public forum.

Speech in a traditional public forum is afforded maximum constitutional protection. Accordingly, government regulation of speech in a traditional public forum is subject to strict scrutiny and will only be upheld if narrowly tailored to serve a

11

compelling governmental interest. *U.S. v. Grace*, 461 U.S. 171, 177 (1983). However, where the government limits the time, place, or manner of speech in a traditional public forum without reference to the subject matter of the speech or the viewpoint expressed, intermediate scrutiny applies. *Id*. In such a situation, government regulation of speech is constitutional, provided it is narrowly tailored to serve an important governmental interest, and leaves open ample alternative channels for communication of information. *Id*.

The District Court concluded that the restriction placed on McTernan's speech was content-neutral, was narrowly tailored to serve a compelling government interest, and left open ample alternatives for McTernan to communicate with Clinic clients. The District Court discounted McTernan's claim that the interest in safety was mere pretext, reasoning that the near-miss involving McTernan, as well as a second, unrelated traffic incident in the alley, justified the restriction.

On appeal, McTernan contends that he was targeted solely because of his pro-life views, that the threat of arrest burdened his religiously motivated expression and speech, and that the District Court overstated the safety concerns presented by his activities in the alley.[4]

---

[4] McTernan appeals the District Court orders granting Sergeant Barth's motion for summary judgment, and granting in part and denying in part Defendants' motion to dismiss. We exercise jurisdiction over his appeal of both orders under 28 U.S.C. § 1291.

## II.

The intersection of the various First Amendment rights at play here is reminiscent of a law school exam. We will attempt to parse the relevant issues in our analysis to provide guidance to the District Court, as we conclude that there are genuine issues of material fact that require us to remand.

### A.

Our review of the District Court's grant of summary judgment is plenary. *AT&T v. JMC Telecom, LLC*, 470 F.3d 525, 530 (3d Cir. 2006). Summary judgment is only appropriate if there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. *Id.* In reviewing the District Court's grant of summary judgment, we review the facts in the light most favorable to the nonmoving party. *Id.*

We note at the outset that whether a restriction on the time, place, or manner of speech is reasonable presents a question of law. However, the reasonableness of a restriction involves an underlying factual inquiry. Under *Ward,* the challenged restriction must be (1) content-neutral, (2) narrowly tailored to serve an important governmental interest, and (3) leave open ample alternatives for communication of information. These elements involve subsidiary fact questions that must be submitted to a jury, except where the evidence applicable to a particular element entitles a party to judgment as a matter of law. *See Pouillon v. City of Owosso*, 206 F.3d 711, 717-18 (6th Cir. 2000)*; see also Ovadal v. City of Madison*, 416 F.3d 531, 537-38 (7th Cir. 2005); *cf. Colacurcio v. City of Kent*,

13

163 F.3d 545, 558 (9th Cir. 1998) (Reinhardt, J. dissenting) (concluding that plaintiffs introduced legally sufficient evidence that the challenged restriction was not content-neutral, requiring submission of the issue to a jury).

We review the District Court's grant of Defendants' motion to dismiss *de novo. Omnipoint Commc'ns Enters., L.P. v. Newtown Twp.*, 219 F.3d 240, 242 (3d Cir. 2000). We must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

In *Bell Atlantic Corp. v. Twombly*, the Supreme Court confirmed that Fed. R. Civ. P. 8(a)(2) "'requires only a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" and that this standard does not require "detailed factual allegations." 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). However, "a plaintiff's [Rule 8] obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 127 S.Ct. at 1964-65). In other words, Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief" that rises "above the speculative level." *Id.* at 231-32 (quoting *Twombly*, 127 S.Ct. at 1965 & n. 3). "Rule 8(a)(2) requires that the 'plain

14

statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Id.* at 231 (quoting *Twombly*, 127 S.Ct. at 1966).

A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits. *Id.* (quoting *Twombly*, 127 S.Ct. at 1964-65). The Supreme Court's *Twombly* formulation of the pleading standard "'does not impose a probability requirement at the pleading stage,'" but instead "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence' of the necessary element." *Id.* at 234 (quoting *Twombly*, 127 S.Ct. at 1965).

**B.**

McTernan contends that Sergeant Barth's directive not to stand in Rose Alley violated his First Amendment right to the free exercise of religion. The Free Exercise Clause of the First Amendment, applicable to state action through the Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." The Free Exercise Clause not only forbids regulation of religious beliefs as such but also protects religiously motivated expression. *Employment Div., Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872, 877 (1989). Here, McTernan's activities at the Clinic are indisputably animated by sincerely held Christian beliefs.

The Free Exercise Clause, however, does not afford absolute protection to religiously motivated expression. Where

15

a law is "neutral and of general applicability[,]" it "need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Smith*, 494 U.S. at 880). If, on the other hand, the government action is not neutral and generally applicable, strict scrutiny applies, and the government action violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002). Government action is not neutral and generally applicable if it burdens religious conduct because of its religious motivation, or if it burdens religiously motivated conduct but exempts substantial comparable conduct that is not religiously motivated. *See Hialeah*, 508 U.S. at 543-46; *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004).[5]

---

[5] Alternatively, McTernan contends that strict scrutiny is appropriate under a "hybrid rights" theory, regardless of whether the challenged restriction is "neutral" and "generally applicable." McTernan relies on a footnote in *Tenafly*, where we stated, "Strict scrutiny *may* also apply when a neutral, generally applicable law incidentally burdens rights protected by 'the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press,' . . . ." 309 F.3d at 165 n.26 (quoting *Smith*, 494 U.S. at 881) (emphasis added). We have neither applied nor expressly endorsed a hybrid rights theory, and will not do so today. McTernan has not articulated reasons specifically supporting our application of the doctrine here. Our reluctance to do so is

16

reinforced by the decisions of our sister courts. *See, e.g.*, *Hialeah*, 508 U.S. at 566-67 (Souter, J., dissenting) (dismissing doctrine as "ultimately untenable"); *Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419, 440 n.45 (9th Cir. 2008) (declining to adopt doctrine after noting widespread scholarly criticism); *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001) (describing hybrid rights theory as *dicta* and not binding on this court); *Kissinger v. Bd. of Trs. of Ohio State Univ.*, 5 F.3d 177, 180 (6th Cir. 1993) (describing doctrine as "completely illogical" and declining to recognize it until Supreme Court expressly does so itself); *Littlefield v. Forney Indep. Sch. Dist.*, 108 F.Supp.2d 681, 704 (N.D. Tex. 2000) (refusing to apply doctrine, which is likely based upon a misreading of *Smith*, 494 U.S. at 881-82, *aff'd* 268 F.3d 275 (5th Cir. 2001)); *Warner v. City of Boca Raton*, 64 F.Supp.2d 1272, 1288 n.12 (S.D. Fla. 1999) (finding hybrid rights language in *Smith* to be *dicta*); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 12.3.2.3 at 1215-16 (2d ed. 2002) (calling doctrine's contours "unclear").

McTernan does not cite, and the Court is not aware of, any case in which strict scrutiny has been applied to a "neutral" and "generally applicable" regulation restricting the time, place, or manner of religiously-motivated speech. *See Berry v. Dep't of Social Servs.*, 447 F.3d 642, 649 n. 5 (9th Cir. 2006); c*f. Jacobs*, 526 F.3d at 440 n.45 ("Significantly, no court has ever allowed a plaintiff to bootstrap a free exercise claim in this manner. . . . We decline to be the first.") (internal citation omitted). Our refusal to apply a hybrid rights theory here is reinforced by the narrow reach the Supreme Court has given to

Here, McTernan's ability to convey his religiously-motivated message at the Clinic was burdened. Sergeant Barth advised McTernan not to stand, linger, or walk aimlessly in the alley, and threatened to arrest him after he walked through the alley. As a result, McTernan could not use the alley to communicate with clients deposited at the rear entrance of the Clinic.

We first must ask, as the District Court did, whether the prohibition was "neutral" and "generally applicable." Finding no evidence that Sergeant Barth was motivated by hostility to McTernan's Christian beliefs, the District Court concluded that the restriction complied with the principle of "neutrality." The District Court also concluded that the restriction, conveyed to protesters and Planned Parenthood personnel, was "generally applicable," and that Sergeant Barth enforced the restriction evenhandedly. Although Sergeant Barth threatened McTernan alone with arrest, the District Court found that only McTernan violated the restriction. As evidence of Planned Parenthood personnel's compliance with the restriction, the District Court cited Sergeant Barth's observation that "for the most part,

_____

the test set forth in *Shebert v. Verner*, 374 U.S. 298 (1963), requiring strict scrutiny of government actions that substantially burden religious practice. *Smith*, 494 U.S. at 883. Hence, we conclude that McTernan's simultaneous assertion of claims under the Free Exercise and Free Speech Clauses, without more, does not warrant strict scrutiny.

18

people abided by them [his instructions]." M.A. 21, 166.

In determining that the challenged restriction was "generally applicable," the District Court relied, overwhelmingly, on the *articulation* of the restriction to members of both camps. Because Sergeant Barth instructed protesters *and* Planned Parenthood personnel not to stand in the alley, the District Court concluded that the restriction was "generally applicable." *Facial* applicability, however, is not conclusive of whether a restriction is "generally applicable." *Tenafly*, 309 F.3d at 167. A regulation facially applicable to all persons is not "generally applicable" if it is enforced against a category of religiously motivated conduct, but not against a substantial category of conduct "that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." *Blackhawk*, 381 F.3d at 209; *Hialeah*, 508 U.S. at 546; c*f. Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953) (holding that city violated Free Exercise Clause by enforcing ordinance banning meetings in park against Jehovah's Witnesses but exempting other religious groups).

Here, Sergeant Barth excluded McTernan from the alley; however, the record reflects that Planned Parenthood personnel were permitted to walk freely through it. Although Sergeant Barth *initially* instructed protesters and Planned Parenthood personnel that they "were allowed to walk in the alley," and that "travel through the alley was acceptable," he later admonished McTernan that he had to walk through the alley "correctly" and in the "right way" and could not "walk aimlessly" or "English-walk" there. McTernan requested that Sergeant Barth further

19

define these terms, but he declined. M.A. 224. After McTernan walked up and down the alley, Sergeant Barth threatened to arrest him if he did so again. M.A. 220, 224.

Planned Parenthood personnel and Clinic clients, by contrast, walked freely across the alley, as Sergeant Barth acknowledged in his deposition. M.A. 166 (noting that Planned Parenthood volunteers "were allowed to walk in the alley."). There was also evidence in the record of the habitual passage through the alley of clients and escorts. M.A. 219. Sergeant Barth does not contend, however, that he threatened to arrest any person other than McTernan. Nor does the record suggest that Sergeant Barth actually limited the manner in which Planned Parenthood personnel could walk in or through the alley.

In short, while there is not a great deal of evidence in the record as to what was transpiring elsewhere in the alley at the time, it is clear that there was repeated "walking" in the alley by Planned Parenthood escorts and clients. Why McTernan's passage through the alley did not constitute the "correct" or the "right way" of traveling "in" or "through" the alley, while Planned Parenthood volunteers' use of the alley was acceptable, is not apparent from the record. That question presents a fact issue. A reasonable jury could conclude that McTernan and Planned Parenthood personnel's respective use of the alley created equivalent safety hazards, justifying enforcement of the restriction against both groups. Indeed, traffic safety and traffic flow were potentially impaired by the progress of patrons, flanked by escorts, through the alley. Accordingly, a reasonable jury could conclude that the restriction "fails the general applicability requirement . . . [because] it burdens a category of

20

religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." *Blackhawk*, 381 F.3d at 209. In light of the sparse factual record before us, we will remand for a jury determination of this issue.[6]

If not generally applied, a restriction burdening religiously motivated expression must satisfy strict scrutiny – that is, it must serve a compelling government interest and must be narrowly tailored to serve that interest. *Hialeah*, 508 U.S. at 546; *Tenafly*, 309 F.3d at 172. "Compelling" interests, the Supreme Court has explained, identify "interests of the highest order." *Hialeah,* 508 U.S. at 546 (quoting *McDaniel v. Paty*, 435 U.S. 618, 638 (1978)). Relying on precedent and the specific facts here, the

---

[6] A restriction on religiously motivated expression is subject to strict scrutiny unless it is "generally applicable" *and* "neutral." A regulation is not "neutral" if its "object . . . is to infringe upon or restrict practices because of their religious motivation." *Hialeah*, 508 U.S. at 533. We agree with the District Court that there is no evidence here that the restriction was motivated by hostility to McTernan's religious beliefs, rather than safety concerns, and so it complies with the principle of "neutrality." This conclusion flows from the evidence discussed at length below in our analysis of McTernan's free speech claim. Although the District Court's grant of summary judgment on the "neutrality" prong was correct, we apply strict scrutiny because a reasonable jury could conclude that the restriction was not "generally applicable."

21

District Court concluded that the restriction served a "compelling" governmental interest – promoting traffic safety in the alley. For its conclusion, the Court cited *Madsen* and *Schenck*, where the Supreme Court, applying intermediate scrutiny, determined that a fixed buffer zone around a reproductive health clinic advanced the "strong" governmental interest in vehicular and pedestrian safety. *Madsen*, 512 U.S. at 758; *Schenck*, 519 U.S. at 375-76. The District Court also emphasized certain characteristics of the alley exacerbating the safety hazard presented, including its narrow physical dimensions and the presence of heavy trucks – conditions that twice nearly resulted in accidents.

The governmental interests asserted to justify the restriction here are narrower than other abortion cases, where protesters impeded women's access to reproductive health services by physically blockading clinic driveways and entrances, and violated the property rights of clinic owners, by trespassing on clinic parking lots and entryways.[7] There, law enforcement officers were faced with potentially violent altercations, with protesters behaving aggressively toward clinic

---

[7]Although Appellant John Holman was charged with trespass, neither Sergeant Barth nor any of the appellee-officers identify preservation of private property rights to justify the challenged restriction. Nor could they plausibly do so, since appellants' presence in Rose Alley, a public street maintained by the City of York, is not private property.

22

personnel,[8] endangering the health of pregnant women prior to surgery, or impinging on the privacy rights of clinic personnel by picketing outside their homes.[9] Here, by contrast, Sergeant

---

[8]Although disorderly conduct charges were filed on one occasion against Appellant Edward Snell, Sergeant Barth does not identify preservation of public order, or the threat of violent altercations, to justify the prohibition enforced.

[9]*See, e.g., Schenck*, 519 U.S. at 362-63 (upholding fixed buffer zone around reproductive health clinic where dozens of protesters would conduct "large-scale blockades" of clinic driveways and entrances, throw themselves on top of the hoods of cars, "grab[], push[], and shov[e]" pregnant women with "varying levels of belligerence," and elbow and spit on clinic volunteers, often erupting into violent altercations); *Madsen*, 512 U.S. at 758 (upholding fixed buffer zone around reproductive health clinic, where throngs of up to 400 protesters would congregate in the clinic's driveways, surround clinic patients, and picket outside of clinic employees' private residences. These activities produced "deleterious physical effects," including elevated anxiety and hypertension, on clinic patients, who were required to receive higher doses of sedation to undergo surgical procedures); *New York ex rel. Spitzer*, 273 F.3d at 192 (upholding limited buffer zone around reproductive health clinic where protesters shouted at close range, blocked vehicular and pedestrian access until clients "gave up," and "distracted oncoming cars in aggressive ways"); *Nat'l Org. for Women*, 37 F.3d at 649 (upholding injunction prohibiting obstructing access to reproductive health clinic where protesters

23

Barth seeks to justify the restriction solely on grounds of traffic safety. Sergeant Barth does not contend that the challenged restriction was necessary to ensure client access to clinic services, to avoid trespass onto clinic property, to prevent violent altercations between protesters and clients or clinic personnel, to protect the health of pregnant women, or to safeguard the privacy rights of clinic personnel. Moreover, *Madsen* and *Schenck* are of limited use to McTernan. In both cases, the Supreme Court, applying intermediate scrutiny, merely determined that promoting traffic safety and traffic flow constituted "significant" – not "compelling" – governmental interests. *Schenck*; 519 U.S. at 369, 375-76; *Madsen*, 512 U.S. at 758.

On the facts before us, we cannot conclude that the single interest asserted by Sergeant Barth is "compelling" as a matter of law. We accept, as a general proposition, that police have an interest in safety and avoiding collisions between cars and pedestrians in the alley. It surely is an important interest, in the abstract, but query whether the interest was "compelling" in this fact pattern. The DVDs supplied by the plaintiffs depict a peaceful setting, with very few people outside the Clinic. It is undisputed that the alley is lightly traveled. We also find unpersuasive the incident identified by Sergeant Barth, and credited by the District Court, to justify the restriction. When Sergeant Barth first instructed advocates to stay out of the alley, he cited an incident in which McTernan was nearly struck by a

engaged in day-long physical blockades of clinic, "creating a risk of physical or mental harm to patients.").

24

car. We do not find that the incident substantiates the existence of a "compelling" safety hazard. Nearly three months separate the incident from the police response it allegedly precipitated. This temporal gap is inconsistent with the urgent safety hazard allegedly created by McTernan's activities.

A second traffic incident in Rose Alley cited by the District Court also does not demonstrate the existence of a "compelling" safety hazard from protesters' use of the alley. In December 2005, a truck nearly struck an anti-abortion advocate while he was conversing with a police officer in the alley, near the intersection with South Beaver Street. Significantly, the restriction was not imposed until approximately ten months after this incident. Hence, we reject the District Court's conclusion that the December 2005 incident demonstrates a "compelling" governmental interest in traffic safety in the alley as a matter of law. *See New York ex rel. Spitzer*, 273 F.3d at 208 ("While narrow regulations may sometimes be necessary, they must be supported by more than a few stories of near-miss traffic accidents . . . ."). Rather, this aspect of the case presents a fact issue for the jury.

Even if the government's interest is found to be compelling, that interest still must be "narrowly tailored." Here, McTernan urges that the least restrictive means of achieving safety would have been for Sergeant Barth to direct traffic:

> Even under a heightened scrutiny analysis, Sergeant Barth's actions fail since any restriction greater than directing traffic would be overbroad and burden too much constitutionally protected

25

activities in an area that is often the most effective place for speech. The trial court, therefore, erred in granting Sergeant Barth's Motion for Summary Judgment.

Appellant's Br. at 28. McTernan's argument is at least facially plausible. Could Sergeant Barth not have maximized safety by directing traffic at the intersection of South Beaver Street and Rose Alley, slowing or stopping the occasional car or truck entering the alley, to permit McTernan to walk in the alley, just as others crossed or passed through the alley? The District Court concluded, without analysis, that the restriction was "narrowly tailored." However, given that the restriction prevented McTernan from being in the alley at all and denied him access to those patrons entering the Clinic from the rear, we are not so sure. Significant fact questions underlie this issue, too, and a jury should decide whether this option was the least restrictive one available to Sergeant Barth.

Accordingly, McTernan's claim under the Free Exercise Clause of the First Amendment should have been submitted to a jury, and it was error to grant summary judgment in favor of Sergeant Barth on McTernan's Free Exercise claim.

**B.**

McTernan maintains that his exclusion from Rose Alley violated his free speech rights under the First Amendment. "The Supreme Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of

those wishing to use the property for other purposes." *Paff v. Kaltenbach*, 204 F.3d 425, 431 (3d Cir. 2000) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 800 (1985)). Under this analysis, "[t]he extent to which the government may limit activity protected by the First Amendment depends largely on the locale where the speech or conduct takes place." *Int'l Soc'y for Krishna Consciousness, Inc.*, 691 F.2d at 159.

The Supreme Court has identified three types of fora: the traditional public forum, the designated public forum, and the nonpublic forum. *Ark. Educ. Television Comm'n* , 523 U.S. at 677. A traditional public forum is defined by the objective characteristics of the property, such as whether the location has long been open to expressive activity. *Id.* It is undisputed that Rose Alley, a thoroughfare maintained by the City of York, is a public forum.

The government may impose reasonable restrictions on the time, place, or manner of speech in a public forum, provided that restrictions "'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward*, 491 U.S. at 791 (quoting *Clark*, 468 U.S. at 293). "[W]hen the government restricts speech, the government bears the burden of proving the constitutionality of its actions." *See U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000) (citing *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 183 (1999)).

27

Applying *Ward*, we must determine whether the restriction here was content-neutral, was narrowly tailored to protect public safety in the alley, and left open ample alternatives for McTernan to communicate his message.

**1.**

The first prong of *Ward* focuses on whether the restriction on speech is content-neutral. The central inquiry is whether "the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (citing *Clark*, 468 U.S. at 295). Finding no evidence of police hostility to McTernan's pro-life views, the District Court concluded that legitimate safety concerns, instead, prompted the restriction. McTernan demurs for two reasons, neither of which is persuasive.

McTernan asks the Court to infer police hostility to his pro-life message from (1) Sergeant Barth's enforcement of the restriction against him, and (2) Planned Parenthood's contract with the York police department, which purportedly authorized Planned Parenthood to direct the conduct of officers assigned to the Clinic.

McTernan adduced no evidence of police hostility to his pro-life message.[10] Although the record shows that Sergeant

---

[10] *See, e.g.*, *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996) (noting that because there is "no disparate-impact theory in First Amendment law," "the fact that a statute . . .

28

Barth prohibited McTernan from walking up and down the alley, while permitting Planned Parenthood personnel to escort patrons across it, there is not a scintilla of evidence suggesting that Sergeant Barth was motivated by disagreement with McTernan's pro-life views. Furthermore, the disparate enforcement here does not support an inference of lack of "content" neutrality. Something must point decisively to a motivation based on the subject matter, or content, of the speaker's message, as opposed to a purpose of avoiding collisions between pedestrians and cars in the alley. *Casey v. City of Newport*, 308 F.3d 106, 111 (1st Cir. 2002) (concluding that government regulation was content-neutral, notwithstanding its disparate effect on different styles of music, because there was "no suggestion in the record that the no-amplification restriction was motivated by the content of . . . [the plaintiff's] performances"); *Gold Coast Publ'ns, Inc. v. Corrigan*, 42 F.3d 1336, 1345 n.10 (11th Cir. 1994) (concluding that government

disproportionately punishes those who hold a certain viewpoint does not 'itself render the [statute] content or viewpoint based.'") (citing *Madsen*, 512 U.S. at 763); *Ater v. Armstrong*, 961 F.2d 1224,1228 (6th Cir. 1992) (finding that statute treating individuals soliciting contributions differently than those distributing literature was content-neutral because it was aimed at the "noncommunicative impact" of conduct rather than the substance of speech itself); *Boos*, 485 U.S. at 320 (upholding disparate treatment of groups espousing different viewpoints, "so long as the justifications for regulations have nothing to do with the content" and are based on the "secondary effect[s]" of the conduct targeted).

29

restriction was content-neutral, notwithstanding the fact that it imposed a greater burden on tabloid-style newspapers than on broadsheet newspapers, because plaintiff "produced no evidence that the City enacted the Ordinance because of a dislike of the messages conveyed by tabloid-style newspapers.").

Second, McTernan cites the contract between Planned Parenthood and the City of York as evidence that Planned Parenthood directed Sergeant Barth to exclude protesters from Rose Alley, thus proving a pro-choice bias. McTernan's allegation is conjecture: there is no evidence that the Clinic conceived of the restriction, or that the contract empowered Planned Parenthood to direct Sergeant Barth's activities at the Clinic. To the contrary, Barth was obligated to enforce the laws of the City of York and to maintain order. M.A. 164-65, 183. McTernan's second argument thus fails.

Hence, the District Court correctly determined that the challenged restriction was content-neutral.

## 2.

Under *Ward*, a content-neutral restriction on the time, place, or manner of speech ordinarily receives intermediate scrutiny and thus will be upheld, provided the restriction serves a significant government interest and is narrowly tailored to serve that interest. *Ward*, 491 U.S. at 791.

### (i)

In our analysis of McTernan's Free Exercise claim, we

30

rejected the District Court's conclusion that the challenged restriction, which promoted traffic safety in Rose Alley, necessarily served a "compelling" governmental interest. We found that the specific evidence adduced by Barth did not establish a "compelling" safety hazard as a matter of law. Nonetheless, following *Madsen* and *Schenck*, we conclude, on the facts before us, that police did have a "significant" interest in promoting the safe, efficient flow of traffic in Rose Alley.

In *Madsen*, the Supreme Court determined that the government had a "strong interest in the public safety and order, [and] in promoting the free flow of traffic on public streets and sidewalks . . . ." 512 U.S. at 767. There, protesters' presence in a street used to access the clinic – Dixie Way – created a clear traffic hazard. *Id.* at 769. Protesters would congregate in Dixie Way, risking collisions with approaching cars. *Id.* To "ensur[e] that petitioners do not block traffic on Dixie Way" and to reduce the risk of an accident, the Supreme Court upheld a fixed buffer zone around clinic entrances and driveways. *Id.*

In *Schenck,* the Supreme Court recognized, similarly, a significant governmental interest in vehicular and pedestrian safety. 519 U.S. at 375-76. There, the Court determined that the presence of protesters in clinic driveways and driveway entrances created a "dangerous situation" because of the "interaction between cars and protesters." *Id.* Citing the significant governmental interest in traffic safety, the Court

31

upheld a fixed buffer zone around the clinic. *Id.* at 376.[11]

Here, as in *Schenck* and *Madsen*, protesters and Planned Parenthood personnel and clients would walk in Rose Alley. The presence of people in a public thoroughfare undoubtedly constituted a distraction for drivers. The physical dimensions of the alley, which was less than 20 feet wide, as well as the presence of heavy trucks, exacerbated this hazard. We find, therefore, that the governmental interest in the movement of pedestrians in Rose Alley, including protesters, while not "compelling," was real and could be termed, "significant."

**(ii)**

To survive intermediate scrutiny, a content-neutral restriction must also be narrowly tailored to achieve the interest asserted. *Ward*, 491 U.S. at 791. The Supreme Court, however, has mandated a "more searching" review where a restriction takes the form of an injunction, rather than a legislative enactment. *Madsen*, 512 U.S. at 768. We must decide whether heightened scrutiny also applies here, because a police directive, such as the one issued by Sergeant Barth, is similar to an injunction. The District Court did not consider whether the form

---

[11] We are cognizant that *Schenck,* analyzing a "combination" of governmental interests rather than solely traffic safety, concluded that these interests were "significant." 519 U.S. at 376. However, *Schenck* cited with approval *Madsen*, where the Court held that promoting traffic safety and traffic flow was itself a significant governmental interest. *Id.*

of the restriction triggers heightened scrutiny.

We rely on the principles enunciated in *Madsen* to determine whether heightened scrutiny is appropriate here. *Id*. There, the Court considered whether intermediate scrutiny governed the constitutionality of a court injunction that, among other things, excluded abortion protesters within a specified radius of a reproductive health clinic. *Id*. at 765. Finding intermediate scrutiny inadequate, the Court observed that injunctions present two risks, warranting a "more stringent application of general First Amendment principles." *Id*. First, injunctions do not emanate from deliberative, democratic decisionmaking processes. *Id*. "Ordinances represent a legislative choice regarding the promotion of particular societal interests. Injunctions, by contrast, are remedies imposed for violations (or threatened violations) of a legislative or judicial decree." *Id*. (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 632-633 (1953)). Second, injunctions, which target discrete groups rather than society generally, may not attract public scrutiny, increasing the likelihood that unreasonable injunctions will escape public condemnation. *Id*. at 764. As the Court observed in *Madsen*, "[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally." *Id*. (quoting *Ry. Express Agency, Inc. v. New York*, 336 U.S. 106, 112-113 (1949)).

We conclude that a police directive, issued by officers in the field, poses risks similar to those presented by an injunction, warranting heightened scrutiny. First, a police directive, like an

injunction, does not embody the popular will but, rather, represents an exercise of executive authority. The absence of democratic involvement was particularly stark here. Sergeant Barth, apparently, conceived the restriction without meaningful public input and without reference to formal policy or administrative channels. Further, Sergeant Barth's directive did not result from deliberative, democratic processes – that is, it was not the product of a "legislative choice regarding the promotion of particular societal interests." *Id*. at 765. Democratic input is especially critical in formulating speech restrictions, which must carefully balance constitutional rights against public safety imperatives. Further, as in *Madsen*, the directives here, which focused on First Amendment activity at a single reproductive health clinic, might easily escape public scrutiny, requiring more vigilant judicial oversight. Hence, a directive issued by officers in the field, such as the one issued by Sergeant Barth, presents constitutional hazards similar to those identified with injunctions in *Madsen*.

Police directives, in fact, present potentially greater opportunities for arbitrary enforcement than injunctions. Whereas injunctions are written, police directives are oral. Oral directives often lack the precision and specificity required of federal injunctions. Moreover, oral police directives are less amenable to judicial, executive, and public oversight.

The concerns identified above – real rather than hypothetical – are illustrated here. Sergeant Barth failed to define permissible and proscribed uses of the alley in clear terms. The restrictions imposed on the protesters varied greatly. Each officer assigned to the Clinic restricted access to the alley

in a different manner: Officer Barth ostensibly prohibited protesters and Planned Parenthood personnel from standing, lingering, or walking aimlessly through the alley; Officer Camacho barred protesters completely from the alley, but granted Clinic personnel unfettered access to it; and Officer Koltunovich, at times, did not restrict protesters' access at all. M.A. 165-66, 183, 220, 224; S.A. 156, 168, 256; H.A. 188-89. Hence, it is appropriate in this case to apply heightened scrutiny to the restrictions enforced by Sergeant Barth.

The application of heightened scrutiny modifies a single, but significant, aspect of the *Ward* analysis – the "tailoring" requirement. Under intermediate scrutiny, a restriction is narrowly tailored to achieve an important governmental interest if that interest would be less effectively achieved without the regulation. *Ward*, 491 U.S. at 799. However, a regulation need not represent the least restrictive means of achieving the articulated aim. *Id.* If a restriction represents the most effective means of accomplishing the stated purpose, it will survive intermediate scrutiny, even if other alternatives would place a lesser burden on individual speech. *Id.*

Heightened scrutiny, by contrast, imposes a more stringent "narrowing" requirement. Proof that a restriction represents the most effective means of achieving the proffered government interest is insufficient. *Madsen*, 512 U.S. at 765. Instead, a restriction will survive heightened scrutiny only if it "burden[s] no more speech than necessary" to serve that interest. *Id*.

Here, we cannot conclude, as a matter of law, that the challenged restriction "burden[s] no more speech than

35

necessary" to protect traffic safety in Rose Alley. *Id*. McTernan identified a plausible alternative to protect pedestrians and drivers in the alley, without curtailing protesters' First Amendment rights. McTernan suggests that Sergeant Barth could have directed traffic at the intersection of Beaver Street and Rose Alley, thus enabling McTernan and other protesters safely to communicate with clients in the alley. The District Court did not address this alternative but concluded that the restriction was "narrowly tailored." It was error for the District Court to conclude, as a matter of law, that excluding protesters from Rose Alley necessarily constituted the least restrictive means of protecting public safety.

The significant fact issues present here also preclude summary judgment on the "tailoring" requirement. A restriction cannot be "narrowly tailored" in the abstract; it must be tailored to the particular government interest asserted. Only when the contours of that interest are clear may we decide whether the means selected to accomplish it have been "narrowly tailored." Here, Sergeant Barth cited traffic safety to justify restricting access to Rose Alley. We previously identified traffic safety as a "significant" governmental interest, but query whether the safety issues are sufficiently defined, on the record before us, to sustain summary judgment that the restriction was "narrowly tailored" to that interest.

We conclude that significant fact questions persist, precluding summary judgment on this issue. There is a paucity of evidence as to the safety hazards presented by protesters' activities in the alley. Largely unknown is how drivers, protesters, and Clinic personnel interacted in the alley. The

record, indeed, is silent on: (1) the number of protesters present in the alley on a typical day; (2) the average speed and volume of traffic in the alley; (3) how frequently the alley was subject to two-way traffic; (4) whether protesters typically stood at the edge, or in the middle, of the alley; and (5) whether protesters regularly conversed with Clinic clients, or whether they solely displayed signs in the alley. Absent this information, we are hard pressed to conclude that Sergeant Barth selected the "least burdensome" alternative to promote traffic safety in the alley as a matter of law.

Accordingly, summary judgment was improper, and the jury should decide this issue on remand.

**3.**

The final *Ward* requirement is that the restriction leave ample opportunities for communication of information. The District Court concluded that McTernan, who could espouse his views from the public sidewalks surrounding the Clinic, possessed adequate alternatives to convey his pro-life message. M.A. 29. McTernan's contention on appeal is a narrow one. He focuses on the alternatives available to communicate with clients using the rear entrance of the Clinic. McTernan contends that access to Rose Alley is critical to engage these clients. McTernan's assertion is factually correct: sustained conversation with clients using the rear entrance is only possible in the alley. However, the First Amendment does not guarantee a speaker an absolute right to actual conversation with his audience in every circumstance. To the contrary, the Supreme Court has repeatedly upheld buffer zones around reproductive

37

health clinics, even where, as a practical matter, the restriction would impede face-to-face interaction with clients. *See Schenck*, 519 U.S. at 376 (upholding 15-foot buffer zone around clinic doorways and driveways); *Madsen*, 512 U.S. at 770 (upholding 36-foot buffer zone around clinic entrances and driveway); *McGuire v. Reilly*, 260 F.3d 36, 49 (1st Cir. 2001) (upholding 18-foot fixed buffer zone around abortion clinics).

In *Madsen*, the Supreme Court considered the constitutionality of a 36-foot buffer zone around the entrances and driveways of an abortion clinic. 512 U.S. at 757. Due to its size, the buffer zone limited opportunities for face-to-face dialogue between protesters and clients. *Id*. Although the buffer zone impeded conversation with clients, it was "narrow enough to place petitioners [protesters] at a distance of no greater than 10 to 12 feet from cars approaching and leaving the clinic." *Id*. at 770. Hence, protesters could still voice their message and display placards as drivers and passengers approached the clinic. Because protesters "could still be seen and heard from the clinic parking lots," the Court concluded that protesters possessed adequate alternatives to communicate their message. *Id.*

We find the alternative communication channels approved in *Madsen* instructive here. As in *Madsen*, the restriction here limits opportunities for conversation with clients using the rear entrance of the Clinic. Nonetheless, McTernan possessed options to make himself "seen and heard." *Id.* Like the protesters in *Madsen*, McTernan could verbalize his message or direct visual placards at drivers entering Rose Alley. Standing on the public sidewalk fronting the clinic, McTernan could position himself within a few feet of cars turning into Rose

Alley – a distance less than that separating protesters and drivers in *Madsen*. Because the alternatives available to McTernan to communicate with his intended audience were equivalent to or greater than those approved in *Madsen*, we conclude that McTernan possessed adequate avenues to communicate with clients, notwithstanding limitations on face-to-face comm-unication. Hence, the District Court properly concluded that this aspect of *Ward* was satisfied.[12]

## III.

McTernan challenges the District Court's dismissal of his claim against the City of York based on Sergeant Barth's alleged violation of his First Amendment rights. Our jurisprudence is clear that "[w]hen a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978)). *Monell* thus created a "two-path track" to municipal liability, depending on whether a §1983 claim is premised on a municipal policy or custom. *Id.*

In *Andrews v. City of Philadelphia*, we expanded on these

_____

[12] We do not address qualified immunity or McTernan's right to specific relief, as these issues were not decided by the District Court. M.A. 29.

two sources of liability:

> A government policy or custom can be established in two ways.  Policy is made when a 'decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy, or edict.  A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanently and well-settled' as to virtually constitute law.

895 F.2d 1469, 1480 (3d Cir. 1990) (quoted in *Beck*, 89 F.3d at 971) (citations omitted).  Custom requires proof of knowledge and acquiescence by the decisionmaker. *Watson v. Abington Twp.*, 478 F.3d 144, 154 (3d Cir. 2007); *Beck*, 89 F.3d at 971.

As noted above, Fed. R. Civ. P. 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief" that rises "above the speculative level." *Phillips*, 515 F.3d at 231-32 (quoting *Twombly*, 127 S.Ct. at 1965 & n. 3). "Rule 8(a)(2) requires that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Id.* at 231 (quoting *Twombly*, 127 S.Ct. at 1966).

Here, McTernan's *Monell* claim rests on four allegations in the complaint:

• "16. Despite the lack of violence, the City of York, its Mayor and Police Chief, have routinely dispatched police officers to Planned Parenthood at the behest of Planned

40

Parenthood, to serve as private security guards for Planned Parenthood. It is believed, and therefore averred, that Planned Parenthood pays for these police officers and directs their actions." M.A. at 46.

- "33. Continuing through the present, Mr. McTernan and others have been periodically threatened with arrest and have on multiple occasions been told to leave the alley." M.A. at 50.

- "34. Mr. McTernan is chilled, frustrated and deterred in the exercise of his First Amendment activities due to the City's policy of ignoring First Amendment right[s.]" M.A. at 50.

- "35. All of the acts of the Defendants and their agents, as alleged herein, were conducted under color and pretense of the statutes, ordinances, regulations, customs, or usages of the City of York or the Commonwealth of Pennsylvania." M.A. at 50.

The District Court concluded that McTernan failed to satisfy the "rigorous standards of culpability and causation" required for municipal liability. M.A. 8 (quoting *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405 (1997)). We agree.

As an initial matter, McTernan fails to specify the relevant "custom" or "policy" here. To satisfy the pleading standard, McTernan must identify a custom or policy, and specify what exactly that custom or policy was. *Phillips*, 515 F.3d. at 232

41

("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests."). Mere assertion of an entitlement to relief, without some factual "showing," is insufficient under Fed. R. Civ. P. 8(a)(2). *Id*. The complaint, which gives no notice as to the Defendants' improper conduct, simply alleges that McTernan's rights were violated "due to the City's policy of ignoring First Amendment right[s.]" M.A. 50. This is not sufficient.

Equally fatal, the four allegations in the complaint relevant to McTernan's *Monell* claim fail to allege conduct by a municipal decisionmaker. Although McTernan maintains that York officers "periodically" instructed protesters to exit the alley, he does not plead knowledge of such directives by a municipal decisionmaker, such as the Mayor or Police Chief. There is no allegation that either the Mayor or the Police Chief were aware of, let alone directed, the restrictions or participated in formulating traffic abatement strategies at the Clinic. Nor do the allegations support, indirectly, such an inference. The complaint alleges nothing more than directives issued *ad hoc* by individual officers, without reference to any formal administrative or policy channels. Hence, the allegations are deficient.

McTernan's complaint simply paraphrases § 1983: "All of the acts of the Defendants and their agents, as alleged herein, were conducted under color and pretense of the statutes, ordinances, regulations, customs, or usages of the City of York or the Commonwealth of Pennsylvania." M.A. 50. "[F]ormulaic

42

recitation of the elements of a cause of action will not do." *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 127 S.Ct. at 1964-65). Because McTernan does not adequately plead a custom or policy, or a link between the challenged restriction and a municipal decisionmaker, the restriction cannot "fairly be said to represent official policy," warranting the imposition of municipal liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (quoting *Monell*, 436 U.S. at 694). Accordingly, the District Court properly dismissed McTernan's *Monell* claim against the City and official capacity suit against Defendants Barth, Brenner, and Whitman.[13]

## IV.

In light of the foregoing, we will AFFIRM the Order of the District Court as to its dismissal of appellant's municipal liability claim and his official capacity claims against Sergeant Barth, Mayor Brenner, and Police Commissioner Whitman. Further, we will VACATE the Order of the District Court as to the other counts of appellant's complaint and REMAND to the District Court for further proceedings in accordance with this Opinion.

---

[13] McTernan contends that *Monell's* requirement that a § 1983 plaintiff establish a "custom or policy" does not apply to his claim for injunctive relief. We do not resolve the issue here, as the argument is made for the first time on appeal and was not addressed by the District Court. M.A. 80.