NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3396
_____

YELLOWBIRD BUS COMPANY, INC.,

Appellant

v.

LEXINGTON INSURANCE COMPANY;
CARMEN BATISTA;
JOSE ROSADO;
BRENDI LOPEZ;
NEENA MEEKER;
FANNY CEPEDA

_____

No. 10-3859

_____

YELLOWBIRD BUS COMPANY, INC.,

Appellant

v.

LEXINGTON INSURANCE COMPANY;
CARMEN BATISTA;
JOSE ROSADO;
BRENDI LOPEZ;
NEENA MEEKER;
FANNY CEPEDA

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civ. No. 2:09-5835)

District Judge: Hon. Eduardo C. Robreno, Jr.
_____
Argued September 21, 2011

Before: AMBRO, CHAGARES, and VANASKIE, <u>Circuit Judges</u>.

(Filed: November 8, 2011)

James L. Griffith, Esq. (*Argued*)
Robert S. Tintner, Esq.
Eric. E. Reed, Esq.
Fox Rothschild LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103

    *Counsel for Appellant Yellowbird Bus Company, Inc.*

Scott. J. Tredwell (*Argued*)
McCormick & Priore, P.C.
Four Penn Center
1600 John F. Kennedy Boulevard
Suite 800
Philadelphia, PA 19103

    *Counsel for Appellee Lexington Insurance Company*

_____

OPINION
_____

CHAGARES, <u>Circuit Judge</u>.

Yellowbird Bus Company ("Yellowbird") appeals the District Court's dismissal of their complaint against Lexington Insurance Company ("Lexington") and five individuals: Carmen Batista, Jose Rosado, Brendi Lopez, Neena Meeker, and Fanny Cepeda (collectively, the "individual defendants"). For the reasons stated below, we

possess jurisdiction over the appeal docketed as 10-3396 and will affirm. We will dismiss the appeal docketed as No. 10-3859.

I.

We write for the parties' benefit and recite only the facts essential to our disposition. Yellowbird is a transportation company whose business includes the daily operation of school buses. On July 5, 2006, a Yellowbird school bus collided with a tractor owned by Cowan Systems, Inc. ("Cowan"). Numerous personal injury lawsuits were subsequently filed against both Yellowbird and Cowan in Pennsylvania state court. Although Yellowbird and Cowan dispute their respective responsibility for the accident, the two parties were able to resolve the majority of the personal injury claims through settlement. The only claims that remain are the ones asserted by the five individual defendants. These claims have been consolidated for resolution and are currently pending in Pennsylvania state court.

During the relevant time period, Yellowbird had an excess insurance policy with Lexington (referred to as the "Lexington Policy" or the "policy") that had an annual premium of $90,193 and was effective for the period between October 7, 2005 and October 7, 2006. Appendix ("App.") 132. This case involves a disagreement between Yellowbird and Lexington pertaining to the extent of Yellowbird's remaining coverage under this policy in regard to the July 5, 2006 accident.

Several provisions of the Lexington Policy are salient to this dispute. The first is the "Coverage" provision, which obliges Lexington to "pay on behalf of [Yellowbird]

3

that portion of the loss which [Yellowbird] will become legally obligated to pay . . .

subject to[] . . . [Lexington's] Limit of Liability as stated in Section IC of the

Declarations." App. 134 (emphases omitted).[1] Section IC of the Declarations then

states:

> C)    Limits of Liability:  $4,000,000
>
> Aggregate Limits – separately as respects:
>
> 1.    Products Hazard and Completed Operations    $4,000,000
> Hazards Combined
>
> 2.    All Other Coverage Combined    $4,000,000
> (Except Automobile Liability, which is not subject to any aggregate limit.)

App. 132. The third relevant provision is entitled "Limits of Liability," and explicates

several key terms:

> A.    Aggregate
>
> This policy is subject to an aggregate limit of liability as stated in the Declarations. This aggregate of liability is the maximum amount which will be paid under this policy for all losses in excess of the underlying policy limits occurring during the policy period applying separately to:
>
> 1.    the products hazard and completed operations hazard combined:
>
> 2.    all other coverages combined, except automobile liability, which is not subject to any aggregate limit.

---

[1] Lexington's obligation to pay under the policy is also subject to the "exhaustion of all applicable underlying limits." App. 134. In this case, the parties do not dispute that Yellowbird's underlying primary insurance policy with National Casualty Company has been exhausted.

B.       Occurrence Limit

> Subject to the above provision respecting aggregate, the Limit of Liability stated in the Declarations as per occurrence is the total limit of our liability for ultimate net loss including damages for care, loss of services or loss of consortium because of personal injury and property damage combined, sustained by one or more persons or organizations as a result of any one (1) occurrence.

C.      Limit Exhaustion

> This policy shall cease to apply after the applicable limits of liability have been exhausted by payments of defense costs and/or judgments and/or settlements.

App. 135 (emphases omitted). Finally, the Lexington Policy defines an "occurrence" as "an event, including continuous or repeated exposures to conditions, neither expected nor intended from the standpoint of [Yellowbird]. All such exposure to substantially the same general condition shall be one occurrence." App. 138 (emphases omitted).

Pursuant to these provisions, Lexington paid approximately $4 million on behalf of Yellowbird in order to effectuate the various settlements arising from the July 5, 2006 accident. After so paying, however, Lexington informed Yellowbird that its coverage under the Lexington Policy for claims arising out of that accident was nearly exhausted. As a result, Lexington maintained that it would not indemnify or defend fully Yellowbird in regard to the five remaining claims filed by the individual defendants.

Yellowbird responded by filing suit in the Philadelphia Court of Common Pleas on November 17, 2009, seeking a declaratory judgment that the Lexington Policy is not subject to any coverage limits in regard to claims arising out of the July 5, 2006 accident.

5

Yellowbird also asserted claims for breach of contract and bad faith. On December 8, 2009, Lexington removed Yellowbird's suit to the District Court on the basis of diversity jurisdiction. On May 11, 2010, the District Court denied Yellowbird's remand motion. Lexington subsequently moved to dismiss Yellowbird's claims pursuant to both Federal Rules of Civil Procedure 12(b)(1) and (12)(b)(6) on December 15, 2009. On July 13, 2010, the District Court denied the 12(b)(1) motion, granted the 12(b)(6) motion, and dismissed the declaratory judgment claim with prejudice and the breach of contract and bad faith claims without prejudice.

Yellowbird chose to appeal without amending its complaint and filed a notice of appeal on August 9, 2010, which was docketed at No. 10-3396. On August 13, 2010, the Clerk of this Court entered an order directing the parties to address whether the District Court's July 13, 2010 opinion was final within the meaning of 28 U.S.C. § 1291. The parties responded as ordered, but on August 23, 2010, the District Court, at Yellowbird's request, filed a second order dismissing Yellowbird's complaint in its entirety. Yellowbird then filed a second notice of appeal on September 22, 2010, which was docketed at No. 10-3859. On March 17, 2011, this Court filed an order consolidating the two appeals for all purposes.

## II.

Although not disputed by the parties, we must initially assess whether the District Court correctly exercised removal diversity of citizenship jurisdiction over this matter

6

pursuant to 28 U.S.C. §§ 1441 and 1332 and whether we possess appellate jurisdiction under 28 U.S.C. § 1291.

We, of course, have an independent duty "to examine [] subject matter jurisdiction at all stages of the litigation sua sponte if the parties fail to raise the issue," and "[t]hat obligation extends to removal cases." U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388-89 (3d Cir. 2002). In this case, the propriety of the District Court's jurisdiction raises two issues. First, the District Court determined that Yellowbird's claims were ripe for review in denying Lexington's motion to dismiss pursuant to Rule 12(b)(1). Second, in denying Yellowbird's remand motion, the District Court held that the individual defendants "are not indispensable parties to this action" and that their "actual interests . . . in this litigation dictate that they be realigned as plaintiffs . . . for purposes of diversity jurisdiction." App. 328 n.1. We are satisfied that the District Court was correct in both regards, and therefore hold that the District Court properly exercised subject matter jurisdiction in this matter.

The issue surrounding our appellate jurisdiction is more technical in nature. This appeal has two separate docket numbers because, as noted, Yellowbird filed two separate notices of appeal. In filing the first notice of appeal from the District Court's July 13, 2010 opinion, Yellowbird "convert[ed] a dismissal with leave to amend into a final order by electing to stand upon the original complaint." Shapiro v. UJB Fin. Corp., 964 F.2d 272, 278 (3d Cir. 1992). We therefore possess jurisdiction over this first appeal, docketed as No. 10-3396. The filing of that appeal, however, was "an event of

7

jurisdictional significance, immediately conferring jurisdiction on a Court of Appeals and divesting a district court of its control over those aspects of the case involved in the appeal." Venen v. Sweet, 758 F.2d 117, 120 (3d Cir. 1985). The District Court was therefore without jurisdiction to issue its subsequent August 23, 2010 order of dismissal. We consequently lack jurisdiction over Yellowbird's appeal from that order, docketed as No. 10-3859. Accordingly, we possess jurisdiction over the appeal docketed as No. 10-3396 and will dismiss the appeal docketed as No. 10-3859 for lack of appellate jurisdiction.

## III.

We review an order granting a motion to dismiss de novo. McTernan v. City of York, 564 F.3d 636, 646 (3d Cir. 2009). To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

The parties do not dispute that Pennsylvania law applies to this diversity matter. Under Pennsylvania law, "the interpretation of the scope of coverage of an insurance contract is a question of law properly decided by the court, a question over which we exercise plenary review." Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999). We recently noted that "[t]he rules of analysis of insurance policies in

8

Pennsylvania are well established." Meyer v. CUNA Mut. Ins. Soc'y, --- F.3d ----, 2011 WL 2040857, at *7 (3d Cir. May 26, 2011). Specifically:

> The goal of interpreting an insurance policy, like that of interpreting any other contract, is to determine the intent of the parties. It begins with the language of the policy. A policy must be read as a whole and its meaning construed according to its plain language.
>
> The burden of drafting with precision rests with the insurance company, the author of the policy. An ambiguity in contract language exists when the questionable term or language, viewed in the context of the entire policy, is reasonably susceptible of different constructions and capable of being understood in more than one sense. Where a term is ambiguous, it is to be construed against the insurer, in favor of the insured. The policy rationale underlying strict application of the doctrine is that because most insurance agreements are drafted by the insurance industry, they are essentially contracts of adhesion.
>
> Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language. Courts should not distort the meaning of the language or strain to find an ambiguity. A contract is not rendered ambiguous merely because the parties disagree about its construction.

Id. (citations and quotation marks omitted).

IV.

Yellowbird appeals the dismissal of its claims for declaratory judgment, breach of contract, and bad faith. All three of these claims are essentially predicated on the assertion that "the policy of excess insurance issued by Lexington is not subject to any limits for the automobile-related claims at issue." Yellowbird Br. 7. Yellowbird seeks a declaration to that effect, as well as damages for Lexington's purported breach of contract and bad faith for failing to abide by Yellowbird's interpretation of the Lexington Policy.

9

As an initial matter, we must distinguish between two of the policy's key terms: "aggregate limits" and "occurrence limits." The provision of the Lexington Policy entitled "Limits of Liability" explains the distinction. "[A]ggregate limit of liability . . . is the maximum amount which will be paid under this policy for all losses . . . <u>occurring during the policy period</u>," while the occurrence limit is "the total limit of [Lexington's] liability for ultimate net loss . . . sustained by one or more persons or organizations <u>as a result of any one (1) occurrence</u>." App. 135 (emphases added). Aggregate limit thus pertains to the maximum amount that Lexington will pay Yellowbird under the policy during a single policy period, which in this case is October 7, 2005 to October 7, 2006. Occurrence limit, by contrast, refers to the maximum amount that Lexington will pay Yellowbird for any one particular "occurrence" – such as the July 5, 2006 accident – that takes place during that policy period.

The parties do not dispute that the July 5, 2006 accident implicates "automobile liability" and that the Lexington Policy provides no <u>aggregate limit</u> in regard to such liability. <u>See</u> App. 132 (stating that automobile liability "is not subject to any aggregate limit"); <u>see also</u> App. 135 (same). Yellowbird argues, however, that the policy also contains no <u>occurrence limit</u> in regard to automobile liability. Pursuant to Yellowbird's interpretation, the Lexington Policy would not only provide unlimited automobile liability coverage during the entire policy period (the aggregate limit), but would also provide unlimited automobile liability coverage for each single occurrence during that period (the occurrence limit). In effect, Yellowbird seeks limitless coverage in regard to

10

any losses arising out of the July 5, 2006 accident. Simply to say this—the policy allowed unlimited liability for any occurrence for an annual premium of just over $90,00—shows on its face the unreasonableness of Yellowbird's claim.

Yellowbird's argument relies on linguistically twisting the language of the "Limits of Liability" provision of the policy, which, as noted, states that "[s]ubject to the above provision respecting aggregate, the Limit of Liability stated in the Declarations as per occurrence is the total limit of [Lexington's] liability for ultimate net loss . . . sustained by one or more persons or organizations as a result of any one (1) occurrence." App. 135. According to Yellowbird, this passage means that the "per occurrence" "Limit of Liability stated in the Declarations," that is, the $4 million amount, is "subject to," or, in Yellowbird's reading, "completely subsumed by," the aggregate limit. Yellowbird thus posits that "it is clear that this policy language borrows as the occurrence limit the same declaration of no applicable aggregate limit in automobile cases." Yellowbird Br. 20-21.

This reading is contrary to the plain language of the policy. Pursuant to the language just quoted, the $4 million "per occurrence" amount "stated in the Declarations" is the occurrence limit, or the maximum amount that Lexington will pay for any single occurrence. This occurrence limit is then "subject to," or "governed by," Black's Law Dictionary 1465 (8th ed. 2004) – rather than completely subsumed by, as Yellowbird contends – the stated aggregate limit, or the maximum amount that Lexington will pay in any given policy period. Here, as noted, the parties agree that the policy provides for an unlimited amount of aggregate automobile liability. The resultant meaning is thus clear:

11

Yellowbird may assert automobile liability claims for an infinite number of occurrences per policy year, but the coverage for each particular occurrence is limited to $4 million.

Accordingly, we hold that the unambiguous language of the Lexington Policy contradicts Yellowbird's proposed interpretation.[2] We will therefore affirm the District Court's dismissal of Yellowbird's request for a declaratory judgment seeking unlimited coverage in regard to the July 5, 2006 accident. We will also affirm the dismissal of the claims for breach of contract and bad faith, which similarly rely on Yellowbird's erroneous interpretation of the Lexington Policy.[3]

V.

For the reasons stated above, we possess jurisdiction over the appeal docketed as 10-3396 and will affirm. We will dismiss the appeal docketed as No. 10-3859.

---

[2] In light of the policy's clear and unambiguous language, we reject Yellowbird's request to consider its "reasonable expectations in purchasing the Lexington Policy" or to remand for "some discovery regarding the meaning of the policy terms." Yellowbird Br. 23.

[3] Yellowbird's bad faith claim is also meritless insofar as it purports to rely on other conduct – such as "Lexington's failure to honor Yellowbird's requests for earlier engagement in discussions to settle." Yellowbird Br. 26.