KING, Circuit Judge,
dissenting:
I lament that, in its haste to wholly and permanently enjoin the City of Baltimore’s enforcement of its duly enacted Ordinance, the district court has flouted foundational legal principles. Rushing to summary judgment, the court subverted the Federal *561 Rules of Civil Procedure — time-tested rules designed to further the venerable constitutional principle of due process, see Nelson v. Adams USA, Inc., 529 U.S. 460, 465, 120 S.Ct. 1579, 146 L.Ed.2d 530 (2000) — by, inter alia, denying the City essential discovery, refusing to view in the City’s favor what evidence there is, and making untoward findings of fact, often premised on nothing more than the court’s own supposition. Meanwhile, thinly disguising its First Amendment as-applied analysis of the Ordinance as a facial review, the court prematurely and unfairly discounted the real possibility that the Ordinance targets only commercial speech, condemned the Ordinance as viewpoint discriminatory, and, applying strict scrutiny, nullified the Ordinance for lack of narrow tailoring. The court’s decision is, in a word, indefensible.
Nevertheless, the panel majority not only endorses the district court’s unseemly approach, but engages in further imprudence. As but one example, while the district court was at least willing to assume that the Ordinance is undergirded by a compelling interest, the majority opines at length on the insufficiency and insincerity of the interests and positions advanced by the City. Because these proceedings have thus followed a course more fitting a kangaroo court than a court of the United States, I write separately in dissent.[1]
I.
In order to properly explain the defective rulings of the district court and the panel majority, I briefly retrace the genesis of the Ordinance and the fleeting procedural history of this case.
A.
In response to congressional and statewide reports that women were being deceived by limited-service pregnancy centers, Baltimore’s City Council conducted hearings on the issue in 2009. As the majority acknowledges, the City Council, prior to its adoption of the Ordinance, specifically considered the 2006 Waxman and 2008 NARAL reports documenting a pattern of deceptive practices by limited-service pregnancy centers nationwide. The Waxman report found that several such centers throughout the county were using deceptive advertising techniques to attract women seeking abortions and comprehensive birth-control services. Those techniques included placing ads in the telephone book’s yellow pages under “abortion services” and on the Internet generated by keyword searches of “abortion” and “abortion clinics.” See J.A.417-18.[2] The NAR-AL report found that similar deceptive practices were being used by limited-service pregnancy centers in Maryland, including in the City of Baltimore. During its 2009 hearings, the City Council heard evidence from a number of women complaining about being deceived by pregnancy center advertising. See id. at 212. One witness related her experience as a teenager, being subjected to anti-abortion advocacy when she visited a pregnancy center because it advertised in the telephone book under “Abortion Counseling.” Id. at 261. A college professor referenced “countless stories” from female students who had similar experiences when they visited pregnancy centers. Id. at 273.
*562 The evidence relied on by the City Council revealed that limited-service pregnancy centers were using questionable tactics to delay women from accessing abortions. Such tactics included counseling women to undergo pregnancy tests and sonograms that were scheduled weeks after their initial pregnancy center visit, and misinforming women about abortion services, including when abortions could be lawfully obtained. Such delays placed the health of women who decided to have abortions at risk, as “[n]umerous studies have shown that it is safest to have an abortion within the first trimester.” See J.A. 331.
Importantly, the City’s Health Department studied the matter and supported the Council’s adoption of the proposed Ordinance, agreeing that it was “imperative that all Baltimore City women have the ability to obtain factual and timely advice on all available health care options.” J.A. 209. Before taking action, the City Council prudently sought the views of the City Solicitor, who concluded that the proposed Ordinance did not contravene the First Amendment. By letter opinion of October 23, 2009, the Solicitor advised the Council that
[the Ordinance] requires disclosure of factual, truthful, non-misleading information; namely, whether or not abortion or birth control services are provided at a given facility. The [Ordinance] serves the purpose of preventing misleading advertising practices of pregnancy services centers and furthers the City’s interest in ensuring a woman seeking these services in the City is fully informed of what services are available at any given location and can find the services that she needs in a timely manner whether they be abortion or birth control services or any of the many other pregnancy related services that a woman may be seeking.... The [Ordinance], therefore, does not violate the 1st Amendment right to freedom of speech.
Id. at 208. During a public hearing on the proposed Ordinance, its sponsor in the Council clarified that the “bill is not about an abortion debate, but a simple sign ... to make sure no one is misled and [pregnancy center clients] know what to expect.” Id. at 211.
Thus, after considering the matter thoroughly, the Council concluded that the various deceptive practices of limited-service pregnancy centers posed a danger to public health. As a result, on December 5, 2009, the City Council enacted the Ordinance, which took effect on January 4, 2010.
B.
On March 29, 2010, the plaintiffs in this case — including the Greater Baltimore Center for Pregnancy Concerns, Incorporated (the “Center”) — challenged the Ordinance in federal court, asserting various constitutional defects, including free speech, free assembly, free exercise, and equal protection, plus related state law claims. On June 4, 2010, barely two months after service of the Complaint— and four days before the City’s responsive pleading was due — the Center moved for summary judgment on its free speech and equal protection challenges. No party had by then either initiated or conducted discovery.[3] Consistent with the lack of discovery, the City, on June 8, 2010, filed a Rule 12(b)(6) motion seeking dismissal of the Complaint. Then, on July 16, 2010, in response to the Center’s summary judgment motion, the City filed a declaration *563 pursuant to Rule 56(f), averring that it could not adequately oppose summary judgment without first conducting discovery (the “Declaration”).[4]
The Declaration specified that the City needed “the opportunity to develop expert testimony to provide factual support for the propositions that deceptive advertising by limited-service pregnancy centers threatens public health in a variety of ways.” J.A. 41. The Declaration also explained that the City desired and required “the opportunity to conduct discovery concerning the advertising that the Center and other limited-service pregnancy centers employ, so [it] may demonstrate [the advertising’s] deceptive character.” Id. at 42. The City requested “discovery to develop factual support for [its] argument that the services offered by [the Center] are a form of commerce, and, therefore, the disclaimer required by the Ordinance is commercial speech.” Id.
Additionally, the City filed the declaration of an expert, Robert W. Blum, M.D., M.P.H., Ph.D. (the “Blum declaration”), seeking to substantiate the City’s compelling interests advanced by the Ordinance. More specifically, Dr. Blum explained that, because family planning improves “the health and well-being” of women and their children, public health is promoted by providing “complete and accurate information to women about their health care options.” J.A. 45. “Women who can plan the number and timing of their births,” Dr. Blum observed, “experience fewer unwanted pregnancies and births and have lower rates of abortion.” Id. Young and poor women, however, are “particularly -vulnerable to being deceived by limited-service pregnancy centers that fail to disclose the scope of services that they provide.” Id. at 46.
On August 4, 2010, the district court heard argument on the City’s motion to dismiss and the Center’s summary judgment motion. The court advised the parties, however, that if it intended to award summary judgment to the Center on its as-applied challenge, discovery would be necessary. By its January 28, 2011 decision, the court denied the City’s discovery requests and converted the City’s pending Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment. See O’Brien v. Mayor of Balt., 768 F.Supp.2d 804, 809-10 (D.Md.2011). The court then treated the parties’ respective submissions as cross-motions for summary judgment, ruling for the Center on its free speech claim and dismissing without prejudice (and as moot) each of the Center’s remaining claims. On January 31, 2011, the court fully and permanently enjoined enforcement of the Ordinance.[5]
*564 II.
A.
As a general proposition, “summary judgment is appropriate only after adequate time for discovery.” Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir.1996) (internal quotation marks omitted). In the main, discovery is essential in a contested proceeding prior to summary judgment because a party can show that the relevant facts are undisputed only by:
(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or
(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
Fed.R.Civ.P. 56(c)(1). Hence, “by its very nature, the summary judgment process presupposes the existence of an adequate record.” Doe v. Abington Friends Sch., 480 F.3d 252, 257 (3d Cir.2007). At minimum, a court “must refuse summary judgment where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition.” See Nader v. Blair, 549 F.3d 953, 961 (4th Cir.2008) (internal quotation marks omitted).
The City took “the proper course” when it filed the Declaration, “stating that it could not properly oppose ... summary judgment without a chance to conduct discovery.” See Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir.2002) (internal quotation marks omitted) (deeming summary judgment award premature where, inter alia, court made its award only six weeks after complaint was filed, before significant discovery). Such a declaration is “broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.” Raby v. Livingston, 600 F.3d 552, 561 (5th Cir.2010) (internal quotation marks omitted); accord Harrods Ltd., 302 F.3d at 245 n. 18. Nevertheless, the district court decided that the City’s discovery requests were merely “an attempt to generate justifications for the Ordinance following its enactment.” O'Brien, 768 F.Supp.2d at 810. The court explained that discovery was unnecessary in examining “whether the Ordinance, on its face, is subject to, and satisfies, the applicable level of scrutiny.” Id. Indeed, the court considered itself constrained to “base its decision on the evidence relied on by the [City] at the time the Ordinance was passed.” Id.
We review for abuse of discretion a district court’s denial of “discovery before ruling on a summary judgment motion.” Nader, 549 F.3d at 959-60. A court abuses its discretion, however, when “its conclusion is guided by erroneous legal principles or rests upon a clearly erroneous factual finding.” Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146 (4th Cir.2012) (internal quotation marks omitted). As explained below, the district court’s rationale for denying the City its right to discovery was patently erroneous.
1.
As an initial matter, the district court legally erred in denying discovery prior to converting the City’s motion to dismiss into a request for summary judgment. The majority states that “the City was on *565 notice that the court would be considering matters beyond the complaint to resolve the plaintiffs’ free speech claim.” Ante at 559. As we have previously explained, however, “notification that a Rule 12(b)(6) motion may be converted is only one of the requirements” for a proper conversion; “[o]nce notified, a party must be afforded a reasonable opportunity for discovery before a Rule 12(b)(6) motion may be converted and summary judgment granted.” Gay v. Wall, 761 F.2d 175, 177 (4th Cir.1985) (internal quotation marks omitted); see E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 450 (4th Cir.2011) (concluding that the court erred in converting a motion to dismiss to a summary judgment motion where the “record indicates that the parties had not yet had the opportunity to conduct reasonable discovery”). The explicit authorization of discovery articulated by Judge Ervin in the Gay decision is applicable precedent here, and is also prescribed by Rule 12(d). That rule provides that, when a Rule 12(b)(6) motion is “treated as one for summary judgment under Rule 56,” the “parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.” Fed.R.Civ.P. 12(d) (emphasis added). This controlling authority has been ignored entirely by the district court and by the majority.
The district court’s justification for refusing to authorize or permit the City to conduct discovery rested on an erroneous perception that further factual development was not germane to the Center’s facial free speech challenge to the Ordinance. I acknowledge that a court may, in the proper circumstances, rule on a “summary judgment motion without allowing further discovery,” where “a facial challenge to an ordinance ... may be resolved as a question of law.” Penn Adver. of Balt., Inc. v. Mayor of Balt., 63 F.3d 1318, 1322-23 (4th Cir.1995), vacated on other grounds, 518 U.S. 1030, 116 S.Ct. 2575, 135 L.Ed.2d 1090 (1996). In such limited circumstances, discovery is unnecessary because “the court’s inquiry is limited to consideration of the ordinance on its face against the background of the government’s objective and the prospect of the ordinance’s general effect,” id. at 1323, “without regard to [an ordinance’s] impact on the plaintiff asserting-the facial challenge,” Educ. Media Co. at Va. Tech, Inc. v. Swecker, 602 F.3d 583, 588 (4th Cir. 2010). In this situation, however, the court neither undertook nor properly conducted a facial analysis of the constitutionality of the Ordinance.
In the First Amendment context, there are two ways for a plaintiff to mount a facial challenge to a statute. First, the plaintiff may demonstrate “that no set of circumstances exists under which the [law] would be valid, i.e., that the law is unconstitutional in all of its applications.” Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (internal quotation marks omitted). Or, second, the plaintiff may show that the law is “over-broad [because] a substantial number of its applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep.” United States v. Stevens, — U.S. -, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010) (internal quotation marks omitted). Here, the district court did not conclude that the Ordinance is invalid in all its applications. For example, it never assessed the potential application of the Ordinance to limited-service pregnancy centers that charge a fee for their services. Indeed, the majority emphasizes instead the Ordinance’s application to “the provision of ‘free services.’ ” Ante at 553-54.[6]
*566 The district court also failed to address “a substantial number” of the Ordinance’s other applications. Put succinctly, its analysis was an as-applied one, focusing almost exclusively on the Ordinance’s application to the Center. For example, on the question of whether the Ordinance regulates commercial or noncommercial speech, the court conducted an as-applied free speech analysis, amply demonstrated by its repeated (and inappropriate) findings on the specific characteristics of the Center:
• “The overall purpose of the ádvertisements, services, and information offered by the CENTER is not to propose a commercial transaction, nor is it related to the CENTER’S economic interest.” O’Brien, 768 F.Supp.2d at 813 (emphasis added);
• “The CENTER engages in speech relating to abortion and birth-control based on strongly held religious and political beliefs rather than commercial interests or profit motives.” Id. (emphasis added);
• “The notion that ‘human life must be respected and protected absolutely from the moment of conception’ is a central tenet of the CENTER’S belief system.” Id. (emphasis added);
• “[T]he disclaimer mandated by the Ordinance introduces the topics of abortion and birth-control. This has an immediate effect on any speech and information offered by the CENTER on these subjects.” Id. at 814 (emphasis added); and
• “At the very least, a disclaimer conspicuous to anyone visiting the CENTER regarding the lack of abortion and birth-control services, mandates the inclusion of a government message concurrent, and intertwined with, Plaintiffs’ delivery of fully protected speech.” Id. at 814 (emphasis added).
Similarly, in assessing whether the Ordinance is viewpoint neutral, the Opinion made what can only be deemed to be as-applied findings. More specifically, it related that:
• “The CENTER’s viewpoint, formed on the basis of sensitive religious, moral, and political beliefs, is the overarching reason for its stark refusal to perform or refer for abortions and certain types of birth-control.” Id. at 815 (emphasis added); and
• “It is revealing that Defendants refer to the Ordinance as a means of mitigating the ‘harm’ caused by Plaintiffs’ underlying ‘propaganda’ speech relating to abortion and contraception. Such descriptions can only support the conclusion that Defendants enacted the Ordinance out of disagreement with Plaintiffs’ viewpoints on abortion and birth-control.” Id. at 816 (emphasis added).
The panel majority elaborates on several of these same factual points. See ante at 553-54, 554-55, 555-56, 556-57.
In dissenting, I cast no aspersions on the use of the as-applied approach in the proper setting. Indeed, it is clear that “[a]s-applied challenges,” with specific factual records, “are the basic building blocks of constitutional adjudication.” Gonzales v. Carhart, 550 U.S. 124, 168, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (internal quotation marks omitted). For a variety of reasons, a court should entertain an as-applied constitutional challenge prior to assessing a facial one and, if the as-applied challenge succeeds, neither reach nor rule on the facial one. See Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 501-02, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). As the Supreme Court has explained, “[fjacial challenges are disfavored” because they “often rest on speculation” and thus “raise *567 the risk of premature interpretation of [laws] on the basis of factually barebones records.” Wash. State Grange, 552 U.S. at 450, 128 S.Ct. 1184 (internal quotation marks omitted). Moreover, a facial challenge may contravene “the principle of judicial restraint that courts should [not] formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.” Id. (internal quotation marks omitted). As my Mend Judge Niemeyer has emphasized, a facial challenge “must be treated cautiously ... because slipping into the embrace of a facial challenge can tend to leave behind the limitations imposed by Article III and [thus] trample on legislative prerogatives, in violation of separation of powers principles.” Preston v. Leake, 660 F.3d 726, 738 (4th Cir.2011) (internal quotation marks omitted).
Because an as-applied analysis was employed by the district court in this ease, the City was unquestionably entitled to conduct discovery proceedings. See Anheuser-Busch, Inc. v. Schmoke, 63 F.3d 1305, 1312 (4th Cir.1995) (Niemeyer, J.) (explaining that, when confronted with an as-applied challenge, a “court is given the task of finding the facts defining that circumstance and determining how the circumstance is impacted by the ... enactment”), vacated on other grounds, 517 U.S. 1206, 116 S.Ct. 1821, 134 L.Ed.2d 927 (1996). The district court acknowledged as much during its August 4, 2010 hearing on the parties’ respective motions, when it recognized that discovery proceedings would be necessary to properly evaluate an as-applied challenge to the Ordinance. See J.A. 127-28, 130 (observing that “[the Center] can’t prevail on [summary judgment] if I’m concerned about [its] individual status,” and assuring that “if what [the Center] did is relevant in this ease[, the City] will have the discovery”).
Alternatively, discovery would be warranted if we were to “treat[ ] this as a true facial challenge, rather than ... an as-applied challenge in the guise of a facial attack.” Cf. Martin v. Stewart, 499 F.3d 360, 378 (4th Cir.2007) (Wilkinson, J., dissenting). As the City points out, a facial challenge would “weigh[ ] in favor of discovery, not against it.” Reply Br. of Appellants 26. For example, “even if [the Center] did not engage in commercial transactions, it [would not necessarily] prevail on a facial challenge [even] if other [limited-service pregnancy centers] in Baltimore did,” including those within the Ordinance’s scope that charge fees. Id. at 26-27 & n. 12. Thus, regardless of the type of analysis utilized — facial or as-applied— the district court abused its discretion by denying the City its right to conduct discovery.
2.
In declining to approve the City’s discovery requests concerning the potential commercial nature of speech targeted by the Ordinance, the district court short-circuited the analysis that was essential to properly deciding the appropriate level of judicial scrutiny. That analysis should have been fact-driven, due to the inherent “difficulty of drawing bright lines that ... clearly cabin commercial speech in a distinct category.” See City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 419, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). The Supreme Court has long grappled with the concept of commercial speech, describing it at various times as speech “confined to the promotion of specific goods or services,” Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 505 n. 12, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), or “related solely to the economic interests of the speaker and its audience,” In re R.M.J., 455 U.S. 191, 204 n. 17, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (internal quotation marks omitted). More recently, the *568 Court has explained that it “usually define[s]” commercial speech “as speech that does no more than propose a commercial transaction.” United States v. United Foods, Inc., 533 U.S. 405, 409, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001).[7] The proposition of a commercial transaction — “I will sell you the X ... at the Y price,” see Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 761, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) — is the “core notion” of commercial speech. See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983).
On the periphery, the distinction between commercial and noncommercial speech “presents a closer question.” Bolger, 463 U.S. at 66, 103 S.Ct. 2875. The Supreme Court has identified “three factors to consider in deciding whether speech is commercial: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech.” Facenda v. NFL Films, Inc., 542 F.3d 1007, 1017 (3d Cir. 2008) (internal quotation marks omitted); accord Adventure Commc’ns, Inc. v. Ky. Registry of Election Fin., 191 F.3d 429, 441 (4th Cir.1999). We have recognized that, although none of the factors is dis-positive, “the confluence of these considerations may permit the conclusion that the speech at issue is commercial in nature.” Adventure Commc’ns, 191 F.3d at 441.
a.
The speech targeted by the Ordinance indubitably satisfies the first two of the Bolger factors — i.e., advertisements referring to a service. The majority surmises, however, that the third factor is absent, because “there is no indication that the Pregnancy Center is motivated by any economic interest.” Ante at 553. Ironically, my good colleagues fault the City for not addressing “what economic interest motivates the Pregnancy Center’s speech,” id., while ratifying the district court’s denial of the City’s discovery requests that were aimed at, inter alia, obtaining such information. The majority simply accepts — as did the district court — the Center’s assertion (by counsel only) that its motives are entirely religious or political. But that assertion — although quite material — was not at all undisputed. The City’s discovery proceedings should have substantiated, inter alia, whether the Center possesses economic interests apart from its ideological motivations.[8] Such discovery is “espe *569 dally important when the relevant facts are exclusively in the control of [the movant]” or “when a case involves complex factual questions about intent and motive.” See Harrods Ltd., 302 F.3d at 247.
In any event, the potential commercial nature of its speech does not hinge solely on whether the Center has an economic motive. Not all of the Bolger factors “must necessarily be present for speech to be commercial.” Bolger, 463 U.S. at 67 n. 14, 103 S.Ct. 2875. Because the Ordinance compels a disclaimer, a court’s “lodestars” in distinguishing commercial from noncommercial speech are the “nature of the speech” regulated by the Ordinance “taken as a whole and the effect of the compelled [disclaimer] thereon.” See Riley v. Nat'l Fed’n of the Blind of N.C., Inc., 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In other words, context matters. From a First Amendment free speech perspective, that context includes the viewpoint of the listener, for “[commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information.” See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 561-62, 567, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (evaluating commercial nature of regulated speech based in part on impact to consumers of electricity); Robert Post, The Constitutional Status of Commercial Speech, 48 UCLA L.Rev. 1, 14 (2000) (observing that “[t]he Court has ... focused its analysis on the need to receive information, rather than on the rights of the speakers”).
The Supreme Court of North Dakota’s decision in Fargo Women’s Health Org., Inc. v. Larson, 381 N.W.2d 176 (N.D.1986), cert. denied, 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986), illustrates the proper contextual analysis. The Larson case involved false and deceptive advertising by the Help Clinic, which, like the Center, provided pregnancy tests and anti-abortion counseling services to its clients at no cost. In determining that the Help Clinic’s advertising constituted commercial speech, the Larson court concluded that the provision of free services was not “dispositive.” 381 N.W.2d at 181. Rather, the court emphasized that
the Help Clinic’s advertisements are placed in a commercial context and are directed at the providing of services rather than toward an exchange of ideas____ In effect, the Help Clinic’s advertisements constitute promotional advertising of services through which patronage of the clinic is solicited, and in that respect constitute classic examples of commercial speech.

Id.

We are unable to properly assess the context of any speech regulated by the Ordinance “because no record evidence of [the Center’s] advertisements exists to guide our review, [thus] we can only speculate about the ways in which the [Ordinance] might be applied to [the Center’s] speech.” See Milavetz, Gallop & Milavetz, P.A. v. United States, — U.S. -, 130 S.Ct. 1324, 1344-45, 176 L.Ed.2d 79 (2010) (Thomas, J., concurring in part) (observing that neither as-applied nor facial challenges could be reviewed properly where there was no evidence of subject advertisements). Nor is there any evidence concerning the Ordinance’s impact on consumers of such information. In ruling as it did, the district court was unconcerned with the full context, because it decided that, even if the Center’s speech “includes some commercial elements, strict *570 scrutiny would nonetheless apply,” since any commercial element was “ ‘inextricably intertwined with otherwise fully protected speech.’” O’Brien, 768 F.Supp.2d at 814 (quoting Riley, 487 U.S. at 796, 108 S.Ct. 2667).
b.
In my view, it was legally erroneous for the district court to conclude, without the benefit of discovery, that the speech at issue blends commercial and noncommercial elements. The court necessarily premised that conclusion on its own finding that the “dialogue between a limited-service pregnancy center and an expectant mother begins when the client or prospective client enters the waiting room of the center.” O’Brien, 768 F.Supp.2d at 814. But such a dialogue may actually begin much earlier, when a prospective client views a limited-service pregnancy center’s advertisements. Indeed, the purpose of the Ordinance was to curb any deceptive advertising. Even if the disclaimer in the waiting room were the “initial communication,” however, the court mischaracterized the disclaimer as “a stark and immediate statement about abortion and birth-control.” Id. The disclaimer does not, as the majority suggests, convey a message that abortion and birth control are “morally acceptable alternative[s].” Ante at 552. The disclaimer simply does not speak to what is or may be morally acceptable. It merely discloses that a particular pregnancy center does not provide or refer for abortions or nondirective and comprehensive birth-control services. That is, the disclaimer relates to the services offered, not to the religious or ideological beliefs of a pregnancy center.
Moreover, “where the two components of speech can be easily separated, they are not ‘inextricably intertwined.’ ” Hunt v. City of L.A., 638 F.3d 703, 715 (9th Cir. 2011) (citing Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 473-74, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). Because the Ordinance merely requires a disclosure that “the center does not provide or make referrals for abortion or birth-control services” — but does not otherwise prescribe the language or terminology to be used — a limited-service pregnancy center could disassociate itself completely from the required disclaimer. Indeed, a limited-service pregnancy center would be free to express its disapproval alongside the disclaimer, or otherwise qualify its viewpoint vis-a-vis the disclaimer.[9] More to the point, however, “[njothing in the [Ordinance] prevents [a pregnancy center] from conveying, or the audience from hearing, ... noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages.” See Fox, 492 U.S. at 474, 109 S.Ct. 3028; see also Fargo, 381 N.W.2d at 181 (concluding it was unnecessary to extend First Amendment protections to the clinic’s “commercial solicitation of clientele” because the clinic could “advocat[e] ... outside the commercial context and *571 receive full First Amendment protection”). Put simply, the Ordinance does not prohibit or restrict a limited-service pregnancy center’s speech about abortion and birth-control.
In sum, the district court’s finding that the Ordinance targeted noncommercial speech or, at most, intertwined commercial and noncommercial speech — as echoed by the majority — was premature and inappropriate. Under the applicable rules of procedure and our precedent, it was essential to the City’s opposition to the Center’s summary judgment motion — and to a fair and proper exercise of judicial scrutiny— for the court to have the benefit of discovery. See, e.g., Gay, 761 F.2d at 177; Fed. R.Civ.P. 12(d) (providing reasonable opportunity for discovery after conversion of Rule 12(b)(6) motion to summary judgment motion). Those discovery proceedings should have yielded, inter alia, any economic motivations of the Center, the context of the Center’s advertisements in relation to the disclaimer, and the degree of entanglement, if any, of the commercial and noncommercial elements of the regulated speech.[10]
3.
In rejecting the City’s right to conduct discovery proceedings regarding the compelling interests advanced by the Ordinance, the district court improperly characterized the City’s request as solely “an attempt to generate justifications for the Ordinance following its enactment.” O’Brien, 768 F.Supp.2d at 810. The court relied on the Supreme Court’s decision in United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), for the proposition that the City’s justification should, not be “invented posthoc in response to litigation.” The City, however, sought only to augment the record with evidence to support its existing justification — not to invent a new one. As we have previously observed, “courts have routinely admitted evidence ... to supplement a legislative record or explain the stated interests behind challenged regulations.” 11126 Balt. Blvd. v. Prince George’s Cnty., Md., 886 F.2d 1415, 1425 (4th Cir.1989), vacated on other grounds, 496 U.S. 901, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990). Although “‘supplemental’ materials cannot sustain regulations where there is no evidence in the preenactment legislative record[, that] is not the case here.” Id.
The majority does not deny that there was a substantial pre-enactment record supporting adoption of the Ordinance; rather, my colleagues simply deem that record insufficient to establish a compelling interest. See Ante at 556 (observing that “the record establishes, at most, only isolated instances of misconduct by pregnancy centers generally” and “the record contains no evidence that any woman has been misled into believing that any pregnancy center ... was a medical clinic or that a woman in Baltimore delayed seeking medical services because of such a *572 misconception”). But criticizing the record as somehow lacking merely begs the real question underlying the errors of the district court: Why was the City denied a full and fair opportunity to conduct discovery and present a proper record?
As Judge Niemeyer recently explained, “the Constitution does not mandate a specific method by which the government must satisfy its burden under heightened judicial scrutiny____ [I]t may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require.” United States v. Carter, 669 F.3d 411, 418 (4th Cir.2012) (remanding “to allow the government to develop a record sufficient to justify its argument” concerning interests advanced by statute). And, when the court’s record is deficient, the government has been permitted to marshal the relevant evidence. See, e.g., Turner Broad Sys., Inc. v. FCC, 512 U.S. 622, 668, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (remanding “to permit the parties to develop a more thorough factual record” because government had failed to demonstrate “that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way”); see also Hayes v. N. State Law Enforcement Officers Ass’n, 10 F.3d 207, 215 (4th Cir.1993) (indicating that remand for discovery would be warranted had the “City ... asked the district court for additional discovery to respond to ... summary judgment, or for additional time to ‘develop the factual record’ in support of its alleged compelling state interest”). We have no discernible reason to stray from such precedent.
B.
Apart from abusing its discretion by denying the City of Baltimore its right to conduct discovery, the district court also erred in concluding that the Ordinance is not viewpoint neutral — its alternative basis for applying strict scrutiny. See O'Brien, 768 F.Supp.2d at 815-16. The majority endorses that conclusion by way of footnote only, agreeing that, because the Ordinance applies solely to persons who do not provide or refer for abortions or nondirective and comprehensive birth-control services, it burdens only “pro-life speakers,” “whose moral or religious codes lead them to oppose abortion and birth control.” Ante at 555 n. 4. It requires no lengthy deliberation to specify examples that entirely undermine the majority’s supposition:
• A Lamaze instructor, who teaches pregnant women and their partners strategies for having a natural, healthy pregnancy and childbirth, may not provide referrals for abortion or birth-control services simply because that is not the objective of her job;
• A doula, who gives advice and emotional assistance to pregnant women during childbirth, would have no cause to even discuss abortion or birth-control, much less make referrals;
• A pregnancy shelter, supplying material assistance and information about pregnancy-related products, may not make referrals for abortion or nondirective and comprehensive birth-control services so as to avoid liability because it has no licensed or trained professionals to address those subjects; and
• A center, encouraging or facilitating adoption services or surrogate pregnancies, may be neither qualified nor disposed to make referrals for abortion or birth-control services.[11]
Absent the premise that the Ordinance burdens only pro-life speakers, the majori *573 ty’s fallback position is legislative history, which, it asserts, demonstrates that the Ordinance was enacted because of an improper animus of the City Council against the Center’s viewpoint on abortion and birth-control. As the majority points out, however, the City “has referred and continues to refer women to the Pregnancy Center.” Ante at 557. If the City disfavors the Center’s viewpoint, or possesses an improper animus against the Center, its continual referrals of women to the Center constitutes an unexplained oddity. In any event, the record validates the City’s uncontradicted contention that the Ordinance was enacted to curtail deceptive advertising, not because the City disagreed with or wanted to suppress the Center’s speech.[12] And the majority has failed to identify any aspects of the record that show otherwise. If there were some ambiguity, however, that would be more reason to conduct full discovery.[13]
C.
Even if all I have said to this point misses the mark, the district court’s award of summary judgment to the Center must nevertheless be vacated. Put simply, there are genuine disputes of material fact regarding the issues of compelling interests and narrow tailoring that must be assessed.
1.
Although the district court assumed that the Ordinance serves a compelling interest, the majority disparages the two such interests espoused by the City: (1) an “interest in protecting the public from ongoing deceptive business practices”; and (2) a “public health interest in ensuring that individuals who seek abortion or comprehensive birth-control services have prompt access to those services.” Br. of Appellants 35-36. In addition to criticizing the incompleteness of the pre-enactment record — which, as previously explained, would be readily remedied with discovery — the majority “question[s] [the City’s] selective pursuit of its interest.” Ante at 557. My fine colleagues protest in their majority opinion that the City is not actually interested in combating inaccurate information about pregnancy services, be *574 cause the Ordinance does not regulate “the vast majority of sources that pregnant women would likely consult.” Id.
The City, however, had an obligation to deal with existing public health problems, without addressing the likelihood of deception from every possible source of information available to pregnant women. See Buckley v. Valeo, 424 U.S. 1, 105, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (observing that a “statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind” (citations and internal quotation marks omitted)). The majority persists, however, that the City could have posted a “notice,” placed a “warning on its own website,” or provided “public service information,” rather than target a pregnancy center’s speech, if it were really interested in combating deceptive practices. Ante at 557. But such criticisms by unelected judges are more a critique on the particular means of serving the City’s compelling interests, discussed infra, than a valid argument that those interests are not compelling.
In any event, the majority’s criticisms are lodged against the City’s first identified compelling interest, with no more than a nod to the second. The City undoubtedly possesses a compelling interest in defending a woman’s right to obtain timely information and medical care in connection with her pregnancy. See Madsen v. Women’s Health Ctr., Inc., 512 U.S. 753, 767, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (agreeing that Florida had a “strong interest in protecting a woman’s freedom to seek lawful medical or counseling services in connection with her pregnancy”). Indeed, the City filed the Blum declaration to further substantiate that very interest. See J.A. 44. Dr. Blum therein explained that public health is advanced by providing complete and accurate information to women about their health care options because, inter alia:
• “The evidence is crystal clear that family planning is one of the best strategies for women in the United States ... to improve their health and well-being, as well as that of their offspring.” Id. at 45;
• “Women who can plan the number and timing of their births experience fewer unwanted pregnancies and births and have lower rates of abortion.” Id.; and
• “Certain people are particularly vulnerable to being deceived by limited-service pregnancy centers that fail to disclose the scope of services that they provide. Those people include adolescents and those who are poor or otherwise marginalized in society.” Id. at 46.
Notwithstanding the foregoing, the Blum declaration — which is uncontroverted — was never referenced by the district court. And, because this is an appeal from summary judgment, the Blum declaration must be viewed in the light most favorable to the City. See Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 551 (4th Cir.1999) (observing that, in reviewing the propriety of summary judgment, an appellate court considers “the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences from the affidavits ... submitted below in his or her favor”). Dr. Blum’s evidence alone was more than sufficient to create a genuine dispute of material fact on the compelling interest requirement. Cf. TFWS, Inc. v. Schaefer, 325 F.3d 234, 241-42 (4th Cir.2003) (vacating summary judgment award because nonmoving party proffered expert *575 reports demonstrating genuine disputes of material fact); McTernan v. City of York, Pa., 564 F.3d 636, 651 (3d Cir.2009) (concluding factual disputes concerning city’s compelling interests barred summary judgment).
2.
Both the district court and the panel majority described the lack of narrow tailoring as the Ordinance’s “fatal” constitutional defect. See ante at 557; O’Brien, 768 F.Supp.2d at 817. On this record, however, such a conclusion simply cannot be sustained.
a.
Notwithstanding all the controversy and litigation this Ordinance has engendered, we must be mindful that we are dealing with a one-sentence, non-verbal, truthful disclaimer posted on a sign in a waiting room. The Ordinance does not otherwise prohibit or inhibit a limited-service pregnancy center’s speech. Indeed, the Ordinance is so minimally burdensome that the majority condemns it as underinclusive— fading “to regulate ‘deceptive practices’ or false advertising,” the City’s first identified compelling interest. Ante at 557-58.
The courts have consistently recognized, however, that, when confronted with false or misleading advertising, “the preferred remedy is more disclosure, rather than less.” See Bates v. State Bar of Ariz., 433 U.S. 350, 375, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (observing that a “disclaimer might be appropriately required ... in order to dissipate the possibility of consumer confusion or deception” (alteration and internal quotation marks omitted)). As we have explained, “[disclosure laws perform the important function of deterring actual corruption and avoiding the appearance of corruption, but unlike other types of restrictive laws,” disclosures have the added advantage of promoting “speech by making more information available to the public and thereby bolstering the ‘marketplace of ideas.’ ” Master Printers of Am. v. Donovan, 751 F.2d 700, 710 (4th Cir.1984). Nevertheless, to go further than a simple waiting room sign — by, for example, legislating precisely what a limited-service pregnancy center must say in an advertisement — could “chase [the City] into overbroad restraints of speech.” Cf. Nat’l Fed’n of the Blind v. FTC, 420 F.3d 331, 345-46 (4th Cir.2005).
b.
In the same vein that it condemns the Ordinance as under inclusive, the majority maintains that the disclaimer is over inclusive because “it applies equally to pregnancy centers that engage in deceptive practices and those whose speech is entirely truthful.” Ante at 558. But the Ordinance applies equally to all limited-service pregnancy centers, due to the inherent potential for consumer confusion and deception concerning the services provided. Cf. Fed. Election Comm’n v. Nat’l Right to Work Comm., 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) (rejecting contention that statute likely applicable to violators and nonviolators alike was overinelusive because it aimed “to prevent both actual and apparent corruption” and “it is the potential for such influence that demands regulation”). In that regard, exempting certain limited-service pregnancy centers could undermine “the efficacy of [the Ordinance’s] overall scheme.” See Am. Legion Post 7 of Durham, N.C. v. City of Durham, 239 F.3d 601, 610 (4th Cir.2001) (deeming ordinance applicable to commercial and noncommercial entities as nevertheless narrowly tailored); cf. Borgner v. Brooks, 284 F.3d 1204, 1214 (11th Cir.2002) (concluding that disclaimer constituted “constitutional alternative, one *576 which is less restrictive, yet sufficient to cure the potential deception and ultimately serving the state’s interest”).
c.
Finally, my good colleagues of the majority suggest that the Ordinance is not the least restrictive means of preventing deceptive advertising by limited-service pregnancy centers. They insist that the City could have undertaken a public education campaign to raise awareness, that it could have distributed information or operated a website about the services offered by such pregnancy centers, or that it simply could have prosecuted offenders of deceptive advertising laws. Pursuant to Supreme Court precedent, “[w]hen a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government’s obligation to prove that the alternative will be ineffective to achieve its goals.” United States v. Playboy Entm’t Group, Inc., 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Put simply, however, the City has never been accorded a meaningful opportunity to satisfy that burden. The Center did not, until it replied concerning its own summary judgment request, propose any less restrictive alternatives. Thereafter, the district court denied the City its right to conduct discovery and awarded summary judgment to the Center. In so doing, the court suggested other less restrictive alternatives. Of course, the City has argued — in both the district court and on appeal — that these alternatives would be ineffectual or less effective. Importantly, however, the City has never had a chance to adduce evidence with respect to those alternatives.
At the very least, however, the City has identified a genuine dispute of material fact on the narrow tailoring requirement. The Ordinance requires only the disclaimer, which is critical to the analysis. As the Supreme Court has most recently again emphasized, a “disclosure is a less restrictive alternative to more comprehensive regulations of speech.” See Citizens United v. Fed. Election Comm'n, — U.S. -, 130 S.Ct. 876, 915, 175 L.Ed.2d 753 (2010). Moreover, “the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed.” Zauderer, 471 U.S. at 651 n. 14, 105 S.Ct. 2265 (1985) (observing that “disclosure requirements trench much more narrowly ... than do flat prohibitions on speech”). Public education campaigns and websites may be successful to some degree, but they do not ensure that every woman who visits a limited-service pregnancy center will be apprised of the services offered there, at a time when such information is most needed. Inadequate or unenforceable deceptive advertising statutes, problems of proof, and scarcity of resources can also impact efforts to prosecute limited-service pregnancy centers. It is worth reiterating that the least restrictive alternatives must be “as effective in achieving the [Ordinance’s] legitimate purpose.” See Reno v. Am. Civil Liberties Union, 521 U.S. 844, 846, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (emphasis added).
Summary judgment is never appropriate where, as here, there are genuine disputes of material fact on the narrow tailoring requirement. See, e.g., Snell v. City of York, Pa., 564 F.3d 659, 669-70 (3d Cir. 2009) (identifying factual issues regarding whether police officer’s restrictions against protester were narrowly tailored to meet government’s compelling interests); Greene v. Solano Cnty. Jail, 513 F.3d 982, 989 (9th Cir.2008) (holding that the court erred in awarding summary judgment “[b]ecause disputed issues of material fact exist as to whether the policy of prohibiting group worship by maximum security prisoners is the least restrictive means of maintaining security”); 729, Inc. v. Kenton *577 Cnty. Fiscal Court, 515 F.3d 485, 504-05 (6th Cir.2008) (vacating summary judgment award where factual issues were apparent on whether ordinance regulating sexually oriented businesses was narrowly tailored); Cmty. for Creative Non-Violence v. Turner, 893 F.2d 1387, 1395 (D.C.Cir.1990) (remanding for development of factual issues concerning whether regulation was sufficiently narrowly tailored to survive First Amendment scrutiny).
III.
Because the district court erred in denying discovery to the City, and in awarding summary judgment to the Center in the face of genuine disputes of material fact, I would vacate the judgment and remand for such further proceedings as may be appropriate.
In these circumstances, I respectfully dissent.

. I dissent from the majority's constitutional ruling in the City’s appeal, No. 11-1111. I have no quarrel with its disposition of the cross-appeal, No. 11-1885, deeming plaintiffs St. Brigid’s and the Archbishop to be without standing.

. Citations herein to "J.A._" refer to the contents of the Joint Appendix filed by the parties in these appeals.

. By applicable rule, no party had the right to serve or seek discovery when the Center’s summary judgment motion was filed. See Fed.R.Civ.P. 26(d)(1) (providing that, unless otherwise stipulated or ordered, "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)”).

. The Declaration was filed pursuant to the version of Rule 56(f) then in effect. Under the 2010 Amendments to the Civil Rules, "[sjubdivision (d) carries forward without substantial change the provisions of former subdivision (f).” Fed.R.Civ.P. 56 advisory committee’s note. The current subdivision (d) of Rule 56 provides:
If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
(1) defer considering the motion or deny it;
(2) allow time to obtain affidavits or declarations or to take discovery; or
(3) issue any other appropriate order.
Fed.R.Civ.P. 56(d).

. At the outset of this litigation, the City agreed not to enforce the Ordinance until December 31, 2010, or until the district court had made a final decision, whichever was earlier. That commitment apparently expired at the end of 2010, prior to the summary judgment award. Nevertheless, had the district court reasonably ascertained from the parties’ submissions that, inter alia, the Center was likely to succeed on its free speech claim, the court should have adhered to Rule 65 and entered a temporary restraining order ("TRO”) against the Ordinance. After entering a TRO, the court should have conducted appropriate proceedings to entertain preliminary and permanent injunction requests. Instead, the court elected to award summary *564 judgment on the merits of the free speech issue, entering a permanent injunction based on an undeveloped record.

. The majority also excludes from its analysis limited-service pregnancy centers that prac *566 tice medicine or are staffed by licensed professionals. See ante at 554-55.

. Notably, we have recognized that, although "speech that proposes a commercial transaction” is "a fairly straightforward” definition of commercial speech, it is also "somewhat circular.” Adventure Commc’ns, Inc. v. Ky. Registry of Election Fin., 191 F.3d 429, 440 (4th Cir.1999) (alteration and internal quotation marks omitted).

. Inquiring into the Center’s potential profit motives may not be a futile endeavor. We know that nonprofit entities with religious or political motives can engage in commerce. See Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 573, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (summer camp sponsored by Christian Science nonprofit substantially affected interstate commerce though camp was not profitable and indeed at times operated on deficit); Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn., 156 F.3d 535, 541 (4th Cir. 1998) (nonprofit land preservation organization’s acceptance of land donation "was commercial”). And, although outwardly the Center appears to be driven by religious purposes only, certain operational intricacies may prove otherwise. For instance, as observed in a similar case, if the Center were "referring women to pro-life doctors in exchange for 'charitable' contributions, the analysis could change.” Evergreen Ass’n, Inc. v. City of N.Y., 801 F.Supp.2d 197, 206 n. 5 (S.D.N.Y.2011). There was “no such evidence” of referrals in exchange for charitable contributions in Evergreen Association, but there the parties had an opportunity to conduct discovery. Id. Here, the prospect that such evidence exists is not so farfetched. Ac *569 cording to certain of the amici curiae — national organizations that network individual pregnancy care centers ("Amici PCCs”) — all of their affiliated centers "make referrals to prenatal care providers for their patients who are pregnant.” Br. of Amici PCCs 7.

. Notably, had the City been permitted to conduct discovery, it could have shown that the Center's website already provides a disclaimer explaining its position: "Our mission is to protect the physical, emotional and spiritual lives of women and their unborn children. We do not perform or refer for abortions because of the physical and emotional risks involved.” Center For Pregnancy Concerns, http://www.cpcforhelp.org (last visited June 19, 2012). The existence of such a disclaimer featured conspicuously on the website contradicts the assertion of the Center’s "representative,” referenced by the majority, that "the Pregnancy Center would not speak to clients and potential clients in the manner required by the ordinance.” Ante at 552. Furthermore, Amici PCCs inform us that they counsel their affiliates to disclose that they do not offer or refer for abortions and, in their advertisements, to "avoid implying that abortion services or professional counseling is available.” See Br. of Amici PCCs 9, 21-22.

. Although not addressed by the district court, and raised only indirectly by the City on appeal, there may well be a legitimate question as to whether the speech targeted by the Ordinance constitutes professional speech. The majority dismisses that possibility because "the pregnancy centers that are subject to Ordinance 09-252 do not practice medicine, are not staffed by licensed professionals, and need not satisfy the informed consent requirement.” Ante at 554-55. I am simply unable to understand how the majority can make such factual findings. In truth, there may be licensed professionals who are subject to the Ordinance. Indeed, Amici PCCs assert that some of its affiliates "operate under the licensure of a physician-medical director [and] provide medical services ... by certified and licensed professionals,” and that "there are 750 such, clinics nationwide, including [the Center].” Br. of Amici PCCs 6-7. Therefore, discovery concerning the possible professional nature of the regulated speech is also warranted.

. The foregoing examples are more appropriate than the district court's effort, made *573 during its hearing on the parties’ respective motions, to compare the Ordinance to a regulation requiring "a non-American car dealership ... to post a sign that says, 'We do not offer cars built in the United States.’ ” J.A. 131. The court posed the hypothetical dealership regulation to suggest that in the same way that "BMW salespeople would ... be handicapped by having their customers read the sign that they don’t want their customers to think about that issue,” the Ordinance disfavors the Center because when a woman "comes in and [the Center] says we don't offer abortions” the woman thinks, "Oh, abortions, yeah, I guess I better ask about that.” Id. The court thus remarked the Ordinance is “not neutral.” Id. Comparing a woman’s right to seek lawful medical treatment to a salesperson's economic interest in keeping his customers ignorant is, as the court initially thought before it made the comparison anyway, "a stupid example.” Id.

. As explained in Part I.A supra, the City Council acted carefully and prudently in its adoption of the Ordinance. Even on this limited record, the evidence supports its action, and the record shows that the Council secured and relied on the advice of counsel. That record, which must be viewed in the light most favorable to the City, fatally undermines any assertion of improper animus against the Center or other limited-service pregnancy centers. Indeed, the record shows conclusively that the animus assertion has been created from whole cloth.

. Notably, the need for discovery was evident in the Opinion's description of the legislative record as "uneven when demonstrating the depth and severity of the problem relating to limited-service pregnancy centers and deceptive advertising.” O’Brien, 768 F.Supp.2d at 816.